IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE:<br>PROSPECT SQUARE 07 A, LLC,<br>    Debtor. | )<br>)<br>)<br>) | Case No. 14-10896-EEB<br>Chapter 11 |
| IN RE:<br>PROSPECT SQUARE 07 B, LLC,<br>    Debtor. | )<br>)<br>)<br>) | Case No. 14-10897-EEB<br>Chapter 11 |
| IN RE:<br>PROSPECT SQUARE 07 C, LLC,<br>    Debtor. | )<br>)<br>)<br>) | Case No. 14-10899-EEB<br>Chapter 11 |
| IN RE:<br>PROSPECT SQUARE 07 D, LLC,<br>    Debtor. | )<br>)<br>)<br>) | Case No. 14-10900-EEB<br>Chapter 11 |
| IN RE:<br>PROSPECT SQUARE 07 E, LLC,<br>    Debtor. | )<br>)<br>)<br>)<br>)<br>) | Case No. 14-10902-EEB<br>Chapter 11<br><br>Jointly Administered<br>Under Case No. 14-10896-EEB |

**MOTION FOR APPROVAL OF SALE OF PROPERTY FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. § 363(f)**

Prospect Square 07 A, LLC, Prospect Square 07 B, LLC, Prospect Square 07 C, LLC, Prospect Square 07 D, LLC, and Prospect Square 07 E, LLC (collectively, the "Debtors"), by and through their attorneys, Kutner Brinen Garber, P.C., move the Court pursuant to 11 U.S.C. § 363(f) for approval of the sale of the Debtors' Property, as defined below, free and clear of liens, claims, encumbrances and interests, and as grounds therefor states as follows:

<u>Background</u>

1.      The Debtors filed separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on January 29, 2014.

2.      The Debtors' cases are being jointly administered under the "lead case," 14-10896-EEB.

3.      The Debtors remain Debtors-in-Possession.

4.     The Debtors are Ohio limited liability companies who own a retail shopping center located on a parcel of property at 9690 Colerain Ave., Cincinnati, Ohio ("Property").

5.     MSCI 2007-IQ 16 Retail 9654, LLC ("MSCI") is a secured creditor in this bankruptcy case holding a mortgage encumbering the Debtors' Property.

6.     During the course of this bankruptcy case, the Debtors and MSCI have been parties to several contested matters and adversary proceedings, including: (1) MSCI's objection to the Debtors' counsel's motion to approve retainer and first application for compensation (Docket Nos. 40 and 123); (2) MSCI's prior objection to the Debtors' original Disclosure Statement (Docket No. 117); (3) MSCI's prior objections to the Debtors' motions for the use of cash collateral (Docket Nos. 39 and 70); (4) *Debtors v. MSCI*, Adversary Proceeding No. 14-01211-EEB (objection to MSCI's Proof of Claim No. 1-1 and for declaratory relief); and (5) *MSCI v. Debtors*, Adversary Proceeding No. 14-01182-EEB (complaint to determine validity, extend and priority of lien of MSCI in retainer).

7.     In order to resolve the then-pending contested matters and adversary proceedings, the parties entered into a DPO Letter Agreement (the "Original Settlement Agreement"). The Original Settlement Agreement was entered into on September 30, 2014, among the Debtors and MSCI. A motion to approve the Original Settlement Agreement was filed on October 1, 2015, and approved on October 21, 2015 (Docket Nos. 174 and 181).

8.     In conjunction with the Original Settlement Agreement, the Debtors previously entered into an Agreement for Purchase and Sale of Real Property dated September 30, 2014, for the sale of the Property ("Original Sale Agreement"). A motion to approve the sale was also filed on October 1, 2015, and approved on October 21, 2015 (Docket Nos. 171 and 182).

9.     After entering into the Original Settlement Agreement and Original Sale Agreement, the Debtors' anchor tenant Kroger announced its intention to expand and relocate elsewhere. The result was immediate uncertainty as to the future tenant income stream, and the likelihood that rental income from the Property and associated valuation would decrease.

10.     As a result, the terms of the Original Settlement Agreement and Original Sale Agreement were not completed.

11.     On January 5, 2015, MSCI filed a Motion for Relief from the Automatic Stay (Docket. No. 196) ("Stay Motion").

12.     On January 22, 2015, the Debtors filed a response in opposition to the Stay Motion (Docket. No. 202).

13.     MSCI was granted relief from stay on February 17, 2015 (Docket No. 214). MSCI obtained the appointment of a Receiver for the Property and commenced foreclosure proceedings in the Common Pleas Court of Hamilton County, Ohio, but has not completed a foreclosure on the Property.  Thus, the Property is still property of the bankruptcy estate.

14.     The Parties have continued to engage in settlement discussions regarding modification of the Original Settlement Agreement or a new agreement.

15.     On June 30, 2015, the Debtors and MSCI entered into a new DPO Letter Agreement (the "Settlement Agreement").  A copy of the Settlement Agreement is attached hereto as Exhibit 1.

16.     In conjunction with the Settlement Agreement, the Debtors have entered into a new *Agreement for Purchase and Sale of Real Property* with ACF Property Management, Inc., a California corporation ("Sale Agreement") for a purchase price of $12,200,000.  A copy of the Sale Agreement, including Exhibits A-E of the Sale Agreement, is attached hereto as Exhibit 2.

17.     The material terms of the Sale Agreement include:

-   Property:  the Debtors' retail shopping center located on a parcel of property at 9690 Colerain Ave., Cincinnati, Ohio ("Property").

-   Purchase Price: $12,200,000.

-   Closing Costs:  Seller and Buyer shall each pay one-half of the escrow fee and the premium charged by the Title Company for a standing owners policy of title insurance.  Buyer (ACF Property Management, Inc.) shall pay: (i) the recording costs for the transaction; (ii) the cost of any updated or new survey; (iii) the additional premium and other charges by Title Company for any extended coverage or any additional endorsements requested by Buyer to the Title Policy; (iv) documentary fees; and (v) a credit to the Debtors in an amount up to $800,000 for Seller's reasonable transaction costs.  Seller shall pay the real property conveyance fee.

-   Closing Date: July 31, 2015, or such earlier date designated by Buyer upon not less than five business days' prior written notice.

-   Closing Agent: Fidelity National Title Insurance Company

18.     The Sale Agreement documents additional details regarding the sale transaction, including, but not limited to, Purchase and Sale (Article 2), Covenants, Warranties and Representations (Article 3), Escrow and Closing (Article 4), Deposit (Article 5), and Miscellaneous (Article 6).

19.     The $800,000 credit is intended to include U.S. Trustee quarterly fees and professional fees, including Brownstein Hyatt Farber Schreck, LLP, Kutner Brinen Garber, P.C., The Conundrum Group, LLP.[1]

<u>Liens Against the Property</u>

20.     On their Schedule D, the Debtors listed the Hamilton County Treasurer with a claim for 2013 real property taxes in the amount of $166,707.70. This claim has already been paid during the course of the Chapter 11 case by stipulation with MSCI.

21.     Any outstanding post-Petition real property taxes will be paid at Closing.

22.     The only other secured claim on the Property is that held by MSCI. On March 12, 2014, MSCI filed Proof of Claim No. 1-1 asserting a secured claim in the amount of $18,768,462.69.

23.     Pursuant to the Settlement Agreement (Exhibit 1), MSCI has agreed to limit its claim to a "Discounted Payoff." In general, the Debtors must pay MSCI the sum of $12,200,000 on or before July 31, 2015 (the "Forbearance Expiration Date") and consent to all funds presently held by MSCI and the Receiver being applied to the indebtedness (the "Discounted Payoff"). *See* paragraphs 2 and 3 of the Settlement Agreement.

24.     Provided no termination event has occurred under the Settlement Agreement, MSCI has agreed it will not conduct a foreclosure sale of the Property, will not execute on any judgment entered in the Guarantor Case (as that term is defined in the Settlement Agreement), and will not enforce the Original Settlement Agreement. *See* paragraph 2 of the Settlement Agreement.

25.     There are no other known liens, claims, encumbrances, or interest against the Property.

---

[1] The Settlement Agreement also acknowledges that the Debtor's legal fees and costs and other closing costs are being reimbursed by Buyer at the closing of the sale of the Property. *See* Settlement Agreement, paragraph 3.

<u>Authority to Sell Pursuant to 11 U.S.C. § 363(f)</u>

26.     Pursuant to 11 U.S.C. § 363(f)(2), the sale of the Debtors' Property free and clear of and liens, claims, encumbrances or interests is appropriate because MSCI has consented to the sale, subject to the provisions set forth herein and in the Settlement Agreement.

27.     Pursuant to 11 U.S.C. § 363(f)(3), the sale of the Debtors' Property free and clear of and liens, claims, encumbrances or interests is appropriate because the purchase price is sufficient to allow the Debtors to pay the agreed upon Discounted Payoff Amount pursuant to the Settlement Agreement.

28.     The Debtors seek Court approval of the terms set forth in the Sale Agreement, Settlement Agreement and this Motion.  In addition, if the within Motion is granted, the Debtors also seek authorization to execute any other documents necessary to consummate the sale of the Property.

29.     The Debtors believe the sale of the Property as proposed under the terms of the Sale Agreement, Settlement Agreement and this Motion is in the best interests of creditors and the estate pursuant to 11 U.S.C. § 363.  If approved, the sale will allow the Debtors to comply with the Settlement Agreement which represents a global and reasonable resolution of the issues that are involved in the bankruptcy proceeding, receivership and foreclosure proceeding. Further, the sale will result in a work-out between the parties and a consensual sale of the Property, without the need for further expense in the pending proceedings.

30.     The Debtors therefor request that the Court approve the sale of the Property pursuant to 11 U.S.C. § 363(f), free and clear of all liens, claims, interests and encumbrances. The Debtors request that this Court find that the Purchaser under the Settlement Agreement shall take title to the Property free of any lien, claims, encumbrances or interests of the Debtors, the bankruptcy estate, and its creditors, as set forth herein.

31.     Because the sale is contingent upon a closing by July 31, 2015, the Debtors have filed a separate motion to shorten the notice/objection period from 21 days to 10 days, requesting a shortened objection deadline of July 13, 2015. The Debtors are working with the Purchaser to arrange for a mutually acceptable closing date after Court approval of this Motion and the Settlement Motion.   MSCI consents to the Debtors' requested shortened notice.

32.     This motion is expressly conditioned upon and subject to the approval of the Settlement Agreement and the Settlement Motion.

WHEREFORE, the Debtors respectfully request entry of an Order (1) authorizing the Debtors to sell the Property free and clear of liens, claims, encumbrances and interests, pursuant to 11 U.S.C. §§ 363(f); (2) approving the terms of the Sale Agreement; (3) authorizing the Debtors to execute any other documents necessary to consummate the sale of the Property; and (4) for such other and further relief as this Court deems proper.

DATED: July 2, 2015.                              Respectfully submitted,

By:/s/Leigh A. Flanagan
    Lee M. Kutner, #10966
    Leigh A. Flanagan, #34916
    **KUTNER BRINEN GARBER, P.C.**
    1660 Lincoln Street, Suite 1850
    Denver, CO 80264
    Telephone:  (303) 832-2400
    Telecopy: (303) 832-1510
    Email:  lmk@kutnerlaw.com
    Email:  laf@kutnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 2, 2015, I served by prepaid first class mail a copy of the foregoing **MOTION FOR APPROVAL OF SALE OF PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS PURSUANT TO 11 U.S.C. SECTION 363(f) AND NOTICE PURSUANT TO LOCAL RULE 9013-1 OF DEBTORS' MOTION FOR APPROVAL OF SALE OF PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. SECTION 363(f)** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED. R. BANKR. P. and these L.B.R. at the following addresses:

Daniel J. Morse, Esq.
Assistant U.S. Trustee
U.S. Department of Justice
308 West 21st Street
Room 203
Cheyenne, WY 82001

James Markus, Esq.
Jeffrey O. McAnallen, Esq.
Markus Williams Young & Zimmerman, LLC
1700 Lincoln Street, Suite 4550
Denver, CO 80203

Robert G. Graham, Esq.
Foster, Graham, Milstein & Calisher, LLP
360 South Garfield Street
6th Floor
Denver, CO 80209

Brownstein Hyatt Farber & Schreck
410 17th Street, Suite 2200
Denver, CO 80202-4432

Chamberlain Contract Sweeping
4320 Mt. Carmel Road
Cincinnati, OH 45244

Duke Energy
P.O. Box 1327
Charlotte, NC 28201-1327

Duke Energy Ohio, Inc.
P.O. Box 960
Cincinnati, OH 45201-0960

GDA Real Estate Management, Inc.
5690 DTC Boulevard
Suite 515
Greenwood Village, CO 80111
ATTN: Gary J. Dragul

GDA Management Services, LLC
5690 DTC Boulevard
Suite 515
Greenwood Village, CO 80111

GDA Real Estate Services, LLC
8301 East Prentice Avenue
Suite 210
Greenwood Village, CO 80111

Goering & Goering, LLC
220 West Third Street
Cincinnati, OH 45202

Greater Cincinnati – Water Works
P.O. Box 742505
Cincinnati, OH 45274-2505

H.C. Nutting Company
P.O. Box 843358
Kansas City, MO 64184-3358

Reinhart & Associates, LLC
517 Broadway, Suite 204
Saratoga Springs, NY 12866

Robbins, Kelley, Patterson & Tucker
7 West 7th Street
Suite 1400
Cincinnati, OH 45202

Schumacher Dugan Construction, LLC
6355 Centre Park Drive
West Chester, OH 45069

The Conundrum Group, LLP
P.O. Box 848
Salida, CO 81201

Trust Capital Group
749 Bayonne Street
Suite 100
El Segundo, CA 90245

Arnold Stulkin
Vice President
MSCI 2007-IQ 16 Retail 9654, LLC
c/o LNR Partners, LLC
1601 Washington Avenue, Suite 700
Miami Beach, Florida 33139

ACF Property Management, Inc.
12411 Ventura Boulevard
Studio City, CA 91604
ATTN: Alan C. Fox

Fidelity National Title Insurance
Company
4643 South Ulster Street
Suite 500
Denver, CO 80237
ATTN: Darren Hone

Vicky Martina

**MSCI 2007-IQ16 Retail 9654, LLC**
**c/o LNR Partners, LLC**
**1601 Washington Avenue, Suite 700**
**Miami Beach, Florida  33139**

### DPO LETTER AGREEMENT
Executed as of June 30, 2015 (the "**Execution Date**")
but effective as of June 30, 2015 (the "**Effective Date**")

<u>**VIA EMAIL AND FEDEX**</u>

*Prospect Square 07A, LLC*
*Prospect Square 07B, LLC*
*Prospect Square 07C, LLC*
*Prospect Square 07D, LLC*
*Prospect Square 07E, LLC*
**c/o GDA Real Estate Services, LLC**
**5690 DTC Boulevard, Suite 515**
**Greenwood Village, Colorado  80111**

Re:    **Loan to *Prospect Square 07A, LLC, Prospect Square 07B, LLC, Prospect Square 07C, LLC, Prospect Square 07D, LLC, Prospect Square 07E, LLC* ("Borrowers")**
**Loan No.: M280207025**

Ladies and Gentlemen:

This letter agreement ("**Agreement**") is entered into between **MSCI 2007-IQ16 Retail 9654, LLC** ("**Lender**"), having an address c/o LNR Partners, LLC, 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139, the current holder of the loan described below (the "**Loan**"), and Borrowers, having an address at 5690 DTC Boulevard, Suite 515, Greenwood Village, Colorado, Capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Documents.

The Loan is evidenced and secured by, among other things, (i) a Promissory Note dated October 10, 2007 (the "**Loan Date**"), in the original principal amount of $12,900,000 (the "**Note**"), executed by Borrowers in favor of Royal Bank of Canada ("**Original Lender**"); (ii) a **Mortgage, Security Agreement, Fixture Financing Statement and Assignment of Leases and Rents** dated as of the Loan Date (the "**Security Instrument**"), executed by Borrowers in favor of Original Lender, recorded/filed October 12, 2007 as Instrument No. 07-0147433 in the official records book 10674, page 01682 of official public records of Hamilton County, Ohio (the "**Records**"); (iii) an Assignment of Leases and Rents (the "**Assignment of Leases**") dated as of the Loan Date executed by Borrowers in favor of Original Lender, recorded as Instrument 07-0147434, page 01725, in the Records; (iv) a Limited Guaranty (the "**Guaranty**") dated as of the Loan Date executed by Gary Dragul ("**Guarantor**") in favor of Lender; and (v) an Environmental Indemnity Agreement (the "**Environmental Indemnity**") dated as of October 10, 2007 executed by Borrowers and Guarantor in favor of Lender.

The Note, the Security Instrument, the Assignment of Leases, the Guaranty, the Environmental Indemnity and any and all other documents evidencing, securing or in any manner relating to the Loan shall be collectively referred to as the "**Loan Documents.**"  For all purposes, this Agreement shall constitute a Loan Document after the date hereof.  Capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Documents.

**Exhibit 1**

Page 2

1.  **Status**.  Borrowers and Guarantor acknowledge that the Loan is in default due in part to Borrowers' failure to timely pay the Loan payment due on May 1, 2010 and subsequent payments, Borrowers' failure to pay real estate taxes on the real property securing the Loan in October 2010, and Borrowers' filing of bankruptcy cases on January 29, 2014 in the United States Bankruptcy Court for the District of Colorado, case nos. 14-10896-EEB, 14-10897-EEB, 14-10899-EEB, 14-10900-EEB, and 14-10902-EEB (the "**Bankruptcy Cases**").  As of March 1, 2015, the unpaid principal balance of the Loan was $12,418,135.53 (the "**Unpaid Principal Balance**").  Interest has accrued on the Unpaid Principal Balance at the note rate specified in the Note (the "**Note Rate Interest**") and at the default rate specified in the Note (the "**Default Rate Interest**"), and such interest will continue to accrue until the Loan is paid in full, unless otherwise provided for in this Agreement.  The Unpaid Principal Balance, the Note Rate Interest and the Default Rate Interest shall collectively be referred to herein as the "**Indebtedness**".  The term "**Indebtedness**" also includes any and all advances, debts, obligations, late payment fees, and liabilities of Borrowers under the Loan Documents or this Agreement, whether voluntary or involuntary, however arising, including, without limitation, advances made by the master servicer of the Loan ("**Master Servicer**"), together with any interest thereon and administration charges and any and all fees, costs and expenses incurred by Lender in connection with Borrowers' default under the Loan, including, but not limited to, advances for unpaid real estate taxes, title expenses, appraisal fees, property inspection costs and legal fees.

Borrowers intend to enter into an Agreement for Purchase and Sale of Real Property (the "**Sale Agreement**"), between Borrowers, as Seller, and ACF Property Management, Inc., a California corporation ("**Buyer**"), as Buyer, which Borrowers have advised is contingent on this Agreement and the Discounted Payoff Amount, as defined below, providing for the sale of the Property (as defined below) encumbered by the Loan Documents for a purchase price of $12,200,000.  Borrowers anticipate that the closing under the Sale Agreement may occur on or before June 30, 2015, but reserve the right to complete the closing under the Sale Agreement on or before July 31, 2015.  Pursuant to the Sale Agreement, Borrower will establish an escrow account ("**Sale Escrow**") with Fidelity National Title Insurance Company as escrow agent (the "**Escrow Agent**").  Borrowers will deliver a true and completely executed copy of the Sale Agreement, including with all amendments thereto, to Lender within two weeks of the Execution Date.

2.  **Forbearance/Abeyance of Pending Matters**.  Subject to the terms of this Agreement and provided no Termination Event (as defined below) occurs, Lender agrees it will not conduct a foreclosure sale of the property encumbered by the Loan Documents (the "**Property**") or execute on any judgment entered in the Guarantor Case (as defined below) or enforce the Original DPO (as defined below), prior to July 31, 2015 (the "**Forbearance Expiration Date**").  The period between the Effective Date and the earlier of (a) the day prior to the Forbearance Expiration Date or (b) the Payoff Date (as defined below) shall be referred to herein as the "**Forbearance Period**."  Borrowers covenant and agree to cooperate with the Receiver appointed by the Hamilton County, Ohio Common Pleas Court to operate the Property (the "**Receiver**") in accordance and in compliance with the Loan Documents during the Forbearance Period, or as otherwise stipulated between Borrowers and Lender.  Borrowers agree as a condition of this Agreement not to interfere with the Receiver's payment of any taxes and insurance premiums due after the Execution Date and prior to the Forbearance Expiration Date unless otherwise provided for in this Agreement.  Borrowers acknowledge and agree that this agreement by Lender to forbear constitutes full consideration for this Agreement and the additional rights and remedies of Lender set forth herein.

3.  **Discounted Payoff**.  Provided no Termination Event has occurred under this Agreement, Borrowers shall be entitled to satisfy its obligation to pay the Indebtedness, without any prepayment premium or penalty thereon, by:

Page 3

(a)    paying Lender by wire transfer, no later than 2:00 p.m. Eastern time on the Forbearance Expiration Date, the sum of $12,200,000 (the "**Cash Portion**"), inclusive of the legal costs and fees incurred by Lender in connection with the negotiation and closing of this Agreement and the transactions contemplated by this Agreement;

(b)    consenting to all funds presently held by Lender or its counsel on account of the Loan, including, without limitation, any escrows, reserves, suspense balances and/or funds in any lockbox or other cash management account held by Lender or its counsel at the time of payoff (collectively, the "**Escrows**"), being applied to the Indebtedness; and

(c)    consenting to all funds presently held by Receiver derived from the Property or rents paid in respect of the Property (the "**Receiver Funds**"), after payment of all expenses related to the Property, being remitted by Receiver to Lender for application to the Indebtedness, pursuant to a written direction letter signed by Borrowers and delivered to the Receiver at least five (5) business days prior to the Closing Date (as hereafter defined).

The items listed in (a), (b), and (c) shall be collectively referred to as the "**Discounted Payoff Amount**". The Cash Portion of the Discounted Payoff Amount must be paid to Lender by wiring immediately available funds as directed by Lender for receipt by Lender upon the closing of the sale of the Property which Cash Portion of the Discounted Payoff Amount shall be received by Lender no later than the Forbearance Expiration Date. Not later than one business day prior to the date of the proposed closing of the sale of the Property pursuant to the Sale Agreement and the associated remittance of the Discounted Payoff Amount to Lender (the "**Closing Date**"), Borrower will furnish Lender with a proposed closing statement in connection with the sale of the Property, which statement shall include a description of the amount of the legal fees and costs and other closing costs incurred by Borrower in connection with the closing of the sale of the Property which costs of Borrower are being reimbursed by Buyer at the closing of the sale of the Property. Prior to the Closing Date, Lender shall deliver to Escrow Agent a release or satisfaction of the recorded Loan Documents duly executed, acknowledged and in proper statutory form for recording, but subject to Lender's timely receipt of the Discounted Payoff Amount on the Closing Date. Borrowers are authorized, upon Lender's acknowledgement of receipt of the Discounted Payoff Amount, to prepare and record/file UCC-3 Terminations with respect to any UCC-1 Financing Statements held by Lender in the Records and/or the Office of the applicable Secretary of State in which the UCC-1 Financing Statement is filed.

4.    **Material Leases**. Borrowers represent and warrant to Lender that, as of the Execution Date, the attached **Schedule 1** (the "**Material Leases Schedule**") includes all existing and proposed Material Leases (as defined below) and all expansions, renewals, modifications, and similar documents with respect to any such Material Leases, that in either case Borrowers or Guarantor or any of their respective affiliates, agents, brokers, employees or any other parties on their behalf has negotiated or entered into within the six (6) month period prior to the Execution Date. In addition, the Material Leases Schedule sets forth with respect to such Material Leases all material terms thereof including, without limitation, the identity of the tenant, square footage, term, rent, rent credits, abatements, work allowances, and tenant improvements, of such Material Leases. For purposes hereof, "**Material Leases**" means all leases, subleases, subsubleases, licenses, concession, kiosk and similar agreements pursuant to which a party is granted a possessory interest in, or right to use or occupy, all or any portion of space in the Property in excess of twenty percent (20%) of the net rentable square feet in the Property.

5.    **Condition of Agreement**. It shall be a condition to Lender's agreement to the terms of this Agreement that:

Page 4

(a)    Guarantor execute and deliver to Lender, simultaneously with Borrowers' execution hereof, the Joinder by and Agreement of Guarantor in form and substance attached hereto; and

(b)    On or before the Closing Date, Borrowers amend their answer to the foreclosure complaint filed in the foreclosure action filed by Lender against Borrowers, styled as *MSCI 2007-IQ16 Retail 9654, LLC v. Prospect Square 07A, LLC, et al.*, Case No. A1305225 pending in the Common Pleas Court of Hamilton County, Ohio (the **"Foreclosure Case"**), in order to acknowledge the representations, warranties, acknowledgements, admissions, releases and waivers made by Borrowers in that certain DPO Letter Agreement between Lender and Borrowers dated as of September 30, 2014 (the **"Original DPO"**). Such amended answer shall, among other things, relinquish the same affirmative defenses Guarantor relinquished in his amended answer filed on May 13, 2015 in the Guarantor Case (as defined in paragraph 23 below).

6.    **Borrowers' Representations, Warranties and Acknowledgments.**    Borrowers represent, warrant, acknowledge, and agree to and with Lender that as of the Effective Date and the Execution Date:

(a)    Borrowers are duly organized, validly existing limited liability companies under the laws of the State of Ohio and are duly qualified to transact business. GDA Real Estate Management, Inc., by Gary Dragul as President (**"Borrowers Signatory"**) is the Manager of each Borrower. Borrowers Signatory, acting alone without the joinder of any other members or managers of Borrowers or any other party, has the power and authority to execute and deliver this Agreement on behalf of and to duly bind Borrowers under this Agreement. Subject to approval of the Bankruptcy Court if the Bankruptcy Cases have not been dismissed, the execution and delivery of, and performance under, this Agreement by Borrowers have been duly and properly authorized by Borrowers and does not and will not (i) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrowers or Borrowers' articles of organization, certificate of formation or operating or limited liability company agreement or any other organizational document of Borrowers, or (ii) result in a breach or constitute or cause a default under any indenture, agreement, lease or instrument to which Borrowers are a party.

(b)    The Loan Documents constitute valid and legally binding obligations of Borrowers and Guarantor and are enforceable against Borrowers, Guarantor and all of the Property in accordance with their terms subject only to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and (ii) the exercise of judicial discretion in accordance with general principles of equity (whether applied by a court of law or of equity). There are no other modifications, verbal or written, to the Loan Documents other than those identified in the description of the Loan set forth above.

(c)    There is a pending sale of the Property for a purchase price of $12,200,000, subject to the execution and delivery of this Agreement. In connection with the closing on same and as a condition of this Agreement, Borrowers shall be obligated to deliver to Lender: (i) no later than three business days prior to the Closing Date, a copy of the proposed closing statement for the sale and (ii) no later than one business day prior to the Closing Date, the executed closing statement for the sale.

(d)    Borrowers and Guarantor, by execution of the Joinder, on behalf of themselves and each and all of their respective past, present and future partners, members, managers, officers, directors, shareholders and heirs and each and all of the successors and assigns of each of the foregoing (collectively, **"Borrowers Parties"**), remise, release, acquit, satisfy and forever discharge Lender, Holders of Morgan Stanley Capital I Inc., Pass-Through Certificates, Series 2007-IQ16) (**"Trust"**), U.S. Bank National Association, a national banking association (**"Trustee"**), and LNR Partners, LLC, Master Servicer and any and all other parties appointed and/or serving as servicers of the Loan (**"Servicer"**), all

Page 5

subsidiaries, parents and affiliates of Lender, Trust, Trustee and Servicer and each of the foregoing parties' predecessors in interest, and each and all of their respective past, present and future partners, members, managers, certificate holders, officers, directors, shareholders, employees, agents, contractors, representatives, participants and heirs and each and all of the successors and assigns of each of the foregoing (collectively, "**Lender Parties**") from any and all manner of debts, accountings, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, inactions, actions, claims, demands and causes of action of any nature whatsoever, whether at law or in equity, known or unknown, either now accrued or subsequently maturing, which any of them now has or hereafter can, shall or may have by reason of any matter, cause or thing, from the beginning of the world to and including the Execution Date, including, without limitation, matters arising out of or relating to (i) the Loan, (ii) the Loan Documents, (iii) the Indebtedness, (iv) the Property, including the development, financing, operation and leasing of same, and (v) any other agreement or transaction between any of Borrowers Parties and any of Lender Parties concerning matters arising out of or relating to the items set forth in subsections (i) - (iv) above. Borrowers and Guarantor on behalf of Borrowers Parties, covenant and agree never to institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature whatsoever against any of Lender Parties by reason of or in connection with any of the foregoing matters, claims or causes of action.

Subject to a Termination Event (as described below), in addition, upon the issuance of a sheriff's, clerk's, trustee's deed or similar for the Property to Lender or its designee pursuant to a judicial or trustee's sale of the Property, or alternatively, Lender's or Lender's designee's acquisition of the Property by a deed in lieu of foreclosure (any of the above, a "**Vesting Document**"), Borrowers and Guarantor, on behalf of Borrowers Parties, shall be deemed to have released acquitted, satisfied and forever discharged Lender Parties from any and all manner of debts, accounting, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, actions, claims, demands and causes of action of any nature whatsoever, whether at law or in equity, whether known or unknown, either now accrued or subsequently maturing, which any of them now or then has or hereafter can, shall or may have by reason of any matter, cause or thing, from the beginning of the world to and including the date the Vesting Document is executed and delivered to Lender, including, without limitation, matters arising out of or relating to (i) the Loan, (ii) the Loan Documents, (iii) the Indebtedness, (iv) the Property, including the development, financing, operation and leasing of same, and (v) any other agreement or transaction between any of Borrowers Parties and any of Lender Parties concerning matters arising out of or relating to the items set forth in subsections (i) - (iv) above. Borrowers and Guarantor, on behalf of Borrowers Parties, covenant and agree never to institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature whatsoever against any of Lender Parties by reason of or in connection with any of the foregoing matters, claims or causes of action.

(e)     Borrowers Parties and Guarantor do not have any defenses, set offs, claims, counterclaims or causes of action of any kind or nature whatsoever against any of Lender Parties with respect to the Loan, the Loan Documents, the Indebtedness, and to the extent that Borrowers might otherwise have any of such claims, Borrowers Parties and Guarantor waive, release and relinquish any and all of such defenses, setoffs, claims and counterclaims.

(f)     All real estate taxes, personal property taxes, sales taxes and similar liabilities, assessments or expenses currently due and payable with respect to the Property have been fully and timely paid or will be fully and timely paid as of closing of the sale of the Property, unless otherwise provided for in this Agreement.

(g)     The Assignment of Leases constitutes an absolute, unconditional, current, assignment of rents, issues and profits from the Property.

Page 6

       (h)      Except for the Bankruptcy Cases and any related adversary proceedings, there are no pending or threatened suits, judgments, arbitration proceedings, administrative claims, executions or other legal or equitable actions or proceedings against Borrowers or the Property, or any liens, mortgages (other than the Security Instrument), claims of lien or other encumbrances against the Property other than the exceptions set forth on Schedule B of Lender's loan title insurance policy (the "**Permitted Encumbrances**"), or any pending or threatened condemnation proceedings or annexation proceedings affecting the Property or any agreements to convey any portion of the Property, or any rights thereto to any person or entity not disclosed in this Agreement, including, without limitation, any government or governmental agency.

       (i)      Neither Borrowers nor Guarantor or any direct or indirect owner of Borrowers has any direct or indirect financial interest in Buyer or any of Buyer's beneficial owners or affiliates as of the Execution Date, and, as of the Closing Date, neither Borrowers nor Guarantor or any direct or indirect owner of Borrowers shall (i) possess or obtain any direct or indirect financial interest in Buyer or any direct or indirect owner of Buyer, or (ii) receive any compensation for the sale of all or any portion of the Property.

       7.     **Lender's Representations, Warranties and Acknowledgments**.  Lender represents, warrants, acknowledges, and agrees to and with Borrowers that as of the Effective Date and the Execution Date:

       (a)      Lender is a duly organized, validly existing limited liability company under the laws of the State of Ohio and is duly qualified to transact business under the laws of the State of Ohio. LNR Partners, LLC is the non-member manager of Lender and the special servicer of the Loan.  LNR Partners, LLC, acting alone without the joinder of any other members or managers of Lender or any other party, has the power and authority to execute and deliver this Agreement on behalf of and to duly bind Lender under this Agreement.  Subject to approval of the Bankruptcy Court, the execution and delivery of, and performance under, this Agreement by Lender has been duly and properly authorized by Lender and does not and will not (i) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Lender or Lender's articles of organization, certificate of formation or operating or limited liability company agreement or any other organizational document of Lender, or (ii) result in a breach or constitute or cause a default under any indenture, agreement, lease or instrument to which Lender is a party.

       (b)      Effective only upon the 91st day after Lender's indefeasible receipt of the Discounted Payoff Amount in accordance with the terms of this Agreement, Lender, on behalf of itself and each and all of its respective past, present and future partners, members, managers, officers, directors, shareholders and heirs and each and all of the predecessors, successors and assigns, and on behalf of the Trust, Trustee, Servicer, and all subsidiaries, parents and affiliates of Trust, Trustee and Servicer and each of the foregoing parties' predecessors in interest, and each and all of their respective past, present and future partners, members, managers, certificate holders, officers, directors, shareholders, employees, agents, contractors, representatives, participants and heirs and each and all of the successors and assigns of each of the foregoing (collectively, "**Lender Parties**"), will remise, release, acquit, satisfy and forever discharge Borrowers and Guarantor and the Borrowers Parties from any and all manner of debts, accountings, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, inactions, actions, claims, demands and causes of action of any nature whatsoever, whether at law or in equity, known or unknown, either now accrued or subsequently maturing, which any of them now has or hereafter can, shall or may have by reason of any matter, cause or thing, from the beginning of the world to and including the closing, including, without limitation, matters arising out of or relating to (i) the Loan, (ii) the Loan Documents, (iii) the Indebtedness, (iv) the Property, including the development, financing, operation and leasing of same, and (v) any other agreement or transaction between any of Borrowers Parties and any of

Page 7

Lender Parties concerning matters arising out of or relating to the items set forth in subsections (i) - (iv) above, including but not limited to the Original DPO. Effective only upon the 91st day after Lender's indefeasible receipt of the Discounted Payoff Amount, Lender on behalf of Lender Parties, covenants and agrees never to institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature whatsoever against any of Borrowers Parties by reason of or in connection with any of the foregoing matters, claims or causes of action; provided, however, from the date of Lender's indefeasible receipt of the Discounted Payoff Amount in accordance with the terms of this Agreement through such 91st day, Lender on behalf of Lender Parties shall not institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature whatsoever against any of Borrowers Parties by reason of or in connection with enforcement of the Loan, the Loan Documents and the Original DPO, unless an action is commenced or threatened against Lender or any of Lender Parties seeking to disgorge or otherwise avoid the payment of the Discounted Payoff Amount.

8.      **No Bankruptcy Intent; Relief from Stay.** Except for the Bankruptcy Cases and related adversary proceedings, none of Borrowers or Guarantor shall take any action to (a) file a voluntary petition with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended (the "**Bankruptcy Code**"); (b) be the subject of any order for relief issued under the Bankruptcy Code; (c) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors; (d) seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, liquidator or assignee for the benefit of creditors; or (e) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustments, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors (each of such actions described above being a "**Debtor Proceeding**"). Borrowers and Guarantor acknowledge that the filing of any petition or the seeking of any relief in a Debtor Proceeding by any of Borrower Parties, whether directly or indirectly, would be in bad faith and solely for purposes of delaying, inhibiting or otherwise impeding the exercise by Lender of Lender's rights and remedies against Borrowers and the Property pursuant to the Loan Documents or at law. In the event that Borrower or Guarantor shall take any action constituting a Debtor Proceeding, and such action causes Lender to seek necessary or appropriate relief: (i) Lender shall thereupon be entitled to and Borrowers and Guarantor irrevocably consent to the relief from any automatic stay imposed by Section 362 of Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies otherwise available to Lender as provided in this Agreement with respect to the Property and as otherwise provided by law, and Borrowers and Guarantor hereby irrevocably waive any right to object to such relief, and acknowledges that no reorganization in bankruptcy is feasible; (ii) Borrowers and Guarantor waive their exclusive rights pursuant to Section 1121(b) of the Bankruptcy Code to file a plan of reorganization and irrevocably agrees and consents that Lender may file a plan immediately upon the entry of an order for relief if an involuntary petition is filed against Borrower or Guarantor or upon the filing of a voluntary petition by Borrowers or Guarantor; (iii) in the event that Lender shall move pursuant to Section 1121(d) of the Bankruptcy Code for an order reducing the 120 day exclusive period, Borrowers and Guarantor shall not object to any such motion, and (iv) Borrowers and Guarantor waive any rights they may have pursuant to Section 108(b) of the Bankruptcy Code.  The provisions of this Section shall survive the termination of this Agreement

9.      **Future Negotiations**.  Borrowers and Guarantor acknowledge and agree that (a) Lender has no obligation whatsoever to discuss, negotiate or to agree to any restructuring of the Loan, or any modification, amendment, restructuring or reinstatement of the Loan Documents or to forbear from exercising its rights and remedies under the Loan Documents, except as expressly provided in this Agreement; (b) if there are any future discussions among Lender, Borrowers and/or Guarantor concerning any such restructuring, modification, amendment or reinstatement, then no restructuring, modification,

Page 8

amendment, reinstatement, compromise, settlement, agreement or understanding with respect to the Loan, the Loan Documents, the Property or any aspect thereof, shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by authorized representatives of the parties; and (c) Borrowers and Guarantor shall not assert or claim in any legal proceedings or otherwise that any such agreement exists except in accordance with the terms of this Section.

10. **Termination Events**. Each of the following shall constitute a termination event ("**Termination Event**"), resulting in the termination of the forbearance and any right of Borrowers to satisfy the Loan by paying the Discounted Payoff Amount granted under this Agreement, entitling Lender to retain and apply any deposit as Lender, in its sole and absolute discretion, deems necessary and appropriate consistent with the terms and provisions of the Loan Documents and Borrower stipulates to relief from the automatic stay so that Lender shall be immediately entitled, without any further notice to Borrowers or Guarantor, to exercise all of its right and remedies under this Agreement and the Loan Documents, in equity and at law, including, but not limited to, demanding immediate payment of the entire Indebtedness of the Loan and commencing or continuing, as applicable, and completing foreclosure proceedings (whether commenced by judicial action or non-judicial power of sale, if applicable) against Borrowers and the Property, including, without limitation, the Foreclosure Case:

(a)     If Borrowers fail to pay the Discounted Payoff Amount to Lender on or before the Forbearance Expiration Date;

(b)     If Borrowers fails to timely and fully pay any other payment required hereunder on or before the Forbearance Expiration Date;

(c)     If Borrowers or Guarantor fail to timely perform any material (as determined by Lender in its sole discretion) non-monetary obligation of Borrowers or Guarantor under the Loan Documents (subject to the terms of this Agreement) or this Agreement;

(d)     If, after the date hereof, Borrowers or Guarantor or any affiliate or relative of Borrowers or Guarantor files suit against any Lender Parties by reason or in connection with the Loan, the administration of the Loan, the Indebtedness, the Property, or any related matters, claims or causes of action;

(e)     If Borrowers or Buyer breaches, cancels, terminates, repudiates, or expresses its intention to withdraw from the Sale Agreement;

(f)     If any of Borrowers interferes with the Receiver's operation of the Property;

(g)     Unless the Bankruptcy Cases have been dismissed, if Borrowers fail to file a motion by July 2, 2015 seeking approval of this Agreement in the Bankruptcy Cases;

(h)     Unless the Bankruptcy Cases have been dismissed, if Borrowers fail to obtain the entry of an order in the Bankruptcy Cases, in form reasonably acceptable to Lender, approving this Agreement on or before July 30, 2015;

(i)     Unless the Bankruptcy Cases have been dismissed, if Borrowers fail to file a motion by July 2, 2015, seeking approval of the Sale Agreement in the Bankruptcy Cases;

(j)     Unless the Bankruptcy Cases have been dismissed, if the Borrowers fail to obtain entry of an order in the Bankruptcy Cases, in form reasonably acceptable to Lender, approving the Sale Agreement on or before July 30, 2015;

Page 9

(k)    If any representation or warranty of Borrowers or Guarantor in this Agreement shall be untrue or inaccurate in any material respect, including, without limitation, in the Material Leases Section or the Material Leases Schedule;

(l)    If the Bankruptcy Cases have been dismissed, if any of the Borrowers files or becomes subject to any Debtor Proceeding; or

(m)    If Guarantor files or becomes subject to any Debtor Proceeding.

11.    **Cooperation of Borrowers and Guarantor upon Termination Event**.  Upon the occurrence of a Termination Event, Borrowers stipulate to relief from the automatic stay in any future Debtor Proceeding and Lender shall immediately be entitled, without further notice to Borrowers or Guarantor to exercise any or all of Lender's rights and remedies under this Agreement  and the Loan Documents, in equity and at law (all of such rights and remedies being cumulative), including, but not limited to and as determined by Lender in its sole discretion, demanding immediate payment of the entire Indebtedness, completing the Foreclosure Case against Borrowers, the Property and/or the other real and personal property securing the Loan (the "**Other Collateral**"), or taking title to the Property and/or the other Collateral by deed in lieu of foreclosure ("**Deed in Lieu of Foreclosure**").  It is the express intent of Borrowers, Guarantor and Lender that, upon the occurrence of a Termination Event, Lender shall be able to acquire possession of and title to the Property and the Other Collateral at the earliest possible date, without interference by and with full cooperation of Borrowers and Guarantor.  In consideration of and as a material inducement to Lender to enter into this Agreement, each of Borrowers and Guarantor agrees to waive and does hereby waive and release any and all defenses and other rights it may otherwise have to contest a Termination Event and Lender's exercise of its rights and remedies in connection therewith and agrees to fully cooperate with the Receiver in the Foreclosure Case related to the Property (the "**Receiver**") and/or the Other Collateral or any other exercise by Lender of its rights and remedies under this Agreement and the Loan Documents, in equity or at law, whether pending on the Execution Date or commenced by Lender following the occurrence of a Termination Event.  In addition, upon the occurrence of a Termination Event, neither Borrowers nor Guarantor shall take any action of any kind or nature whatsoever, either directly or indirectly, to delay, oppose, impede, obstruct, hinder, enjoin or otherwise interfere with, and Borrowers and Guarantor will cooperate and comply with the exercise by Lender of any and all of Lender's rights and remedies against Borrowers or with respect to the Property and the Other Collateral, or any other rights or remedies of Lender with respect to the Loan, the Loan Documents, the Original DPO, and this Agreement, in equity and at law, including, without limitation, any actions by Lender to exercise any assignment of rents and leases, to obtain title to the Property and the Other Collateral by a stipulated judgment of foreclosure or by a consensual Deed in Lieu of Foreclosure, to cause Borrowers or the Receiver to market, sell and convey the Property, or to enforce the Guaranty, whether in the Guaranty Case or otherwise.

12.    **Conveyance Documents**.  Upon the occurrence of a Termination Event and in connection with the Foreclosure Case or a Deed in Lieu of Foreclosure, Borrowers shall execute and deliver to convey to Lender or its designee all documents necessary to convey to Lender or its designee all ownership and development rights with respect to the Property, including, without limitation, a special warranty deed or its equivalent, all applicable state and local transfer forms and bulk sales releases required in connection with such a conveyance, a bill of sale, an assignment and/or other conveyance documents necessary to transfer, convey and assign all leases, any service contracts for which Lender or its designee agrees to accept an assignment, all tangible and intangible, real and personal and mixed property used, useable or intended to be used in connection with the ownership, management and/or use of the Property, and all rights of Borrowers to use any trademarks and logos for all or any portion of the Property, and such documents and instruments, including, without limitation, evidence of the authority of Borrowers to convey the Property to Lender or its designee and the good standing of Borrowers, as Lender, its designee or the title company insuring title to the Property may determine are necessary to

Page 10

issue to Lender or its designee an owner's title insurance policy insuring the fee simple title to the Property, subject only to the Permitted Encumbrances. As further consideration of and as a material inducement to Lender to enter into this Agreement, Borrowers shall not interfere with or oppose Lender in and hereby consent to any (i) action to quiet title, if any, which may be instituted by Lenders and/or any title company on behalf of Lender to perfect its right, title and interest in the Property, and (ii) Lender or its designee substituting into condemnation proceedings with respect to the Property, if any.

13.     **Property Materials**. If following a Termination Event a sheriff's, clerk's or trustee's deed for the Property is issued to Lender or its designee pursuant to a judicial or trustee's sale, or if Lender or its designee acquires the Property by Deed in Lieu of Foreclosure or otherwise, promptly upon request by such acquiring party, Borrowers shall deliver and/or pay to Lender or its designee  the following as to all or any portion of the Property acquired by Lender or its designee: (i) possession of the Property, (ii) the originals (or true and correct copies, if the originals are not available) of all guaranties and warranties given with respect to all or any portion of the Property or any improvement located thereon which Borrowers have in its possession, (iii) the originals (or true and correct copies, if the originals are not available) of all service contracts and management agreements then in effect with respect to the Property, (iv) the originals (or true and correct copies, if the originals are not available) of all plans, specifications, working drawings and surveys of or relating to the Property or to the construction of the buildings and related improvements located thereon, (v) the originals (or true and correct copies, if the originals are not available) of all governmental consents, approvals, licenses, permits, certificates of occupancy, zoning approvals, building permits and similar documents relating to the Property, (vi) copies of all books and records in any way relating to the Property, (vii) the balance of any funds in any security deposit accounts and any and all other tenant security deposits, and any and all advance rentals or similar fees, if any, (viii) the originals (or true and correct copies, if the originals are not available) of all termite or other inspection reports, bonds, warranties and guaranties relating to the Property, (ix) any and all income from the Property received by or on behalf of Borrowers and then being held by or on behalf of Borrower; (x) the originals (or true and correct copies, if the originals are not available) of all certificates, binders and policies of insurance relating to the Property, (xi) the originals (or true and correct copies, if the originals are not available) of all contracts and agreements with contractors, architects, engineers, surveyors and others relating to all or any portion of the Property, (xii) the originals (or true and correct copies, if the originals are not available) of all tenant leases and occupancy agreements affecting all or any portion of the Property, (xiii) all leasing and other files, books and records with respect to all or any portion of the Property, and (xiv) any bankruptcy claims relating to any current or former tenant of the Property, duly assigned to Lender or its designee.

14.     **Cooperation Covenants**. The covenants and agreements of Borrowers and Guarantor contained in the immediately preceding 3 Sections of this Agreement shall be referred to as the "**Cooperation Covenants.**"

15.     **Earnest Money**. If Buyer defaults under the Sale Agreement and Borrowers are entitled to retain the Buyer's Earnest Money Deposit, Borrowers shall authorize and direct the Escrow Agent to deliver, or Borrowers shall deliver (if Escrow Agent delivers the Earnest Money Deposit to Borrowers), to Lender, no later than the Forbearance Expiration Date, any funds actually released by the Sale Escrow, including, without limitation, any earnest money deposits to which Borrowers are entitled under the Sale Agreement (the "**Earnest Money Deposit**"). Notwithstanding the payment to Lender of all or any portion of the Earnest Money Deposit, Lender does not waive any of its rights or remedies against Borrowers or Guarantor under the Loan Documents.

16.     **Liability of Borrowers and Guarantor**. Borrowers and Guarantor agree and acknowledge that they are jointly and severally liable for the Indebtedness and all other obligations of Borrowers to Lender under the Loan Documents.

Page 11

17.    __Indemnity__.  Borrowers agree to indemnify and hold harmless Lender from any liabilities, costs, expenses (including attorneys' and paralegal fees at all tribunal levels) or claims of the State in which the Property is located (the "__State__") or any other governmental agency for documentary stamps, intangible, mortgage or other similar taxes and any interest or penalties thereon which may be or become due in connection with the execution or delivery of this Agreement.

18.    __Costs and Expenses__.

(a)    Borrowers shall pay all costs and expenses incurred or to be incurred by Lender in connection with this Agreement, including, without limitation, the costs of any third party reports obtained by Lender and the legal fees and disbursements of Lender's counsel (collectively, the "__Transaction Costs__").  Borrowers shall pay or shall have paid all the Transaction Costs incurred by Lender (i) in connection with the preparation, negotiation and closing of this Agreement no later than the earlier of the Closing Date and the Forbearance Expiration Date, as part of the Cash Portion of the Discounted Payoff Amount as provided for herein, and (ii) after the first to occur of the Closing Date and the Forbearance Expiration Date, in connection with a breach of any of the Cooperation Covenants or in connection with any other provision of this Agreement that expressly or by its terms survives the Closing Date and the payoff of the Loan, no later than ten business days after Borrowers' receipt of a statement from Lender detailing such Transaction Costs.

(b)    Each of Borrowers and Guarantor acknowledge and agree that Borrowers and Guarantor shall be responsible for all the Transaction Costs incurred subsequent to the execution of this Agreement even if Borrowers fail to pay the Discounted Payoff Amount to Lender on or before the Forbearance Expiration Date.

(c)    The provisions of this Section shall survive the termination of the forbearance provided herein.

(d)    Notwithstanding anything to the contrary in this Agreement, if Borrowers remit the Discounted Payoff Amount on the earlier of the Closing Date and the Forbearance Expiration Date, and otherwise comply with this Agreement, then Borrowers' liability for the Transaction Costs shall be satisfied through the remittance of the Discounted Payoff Amount.

19.    __Full Force and Effect__.  The Loan shall remain unmodified and in full force and effect as a matured obligation.  Except as may be modified by this Agreement, Borrowers agree to comply with all terms and provisions of the Loan Documents.

20.    __Counterparts__.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument.

21.    __Invalid Provision to Affect No Others__.  If any clause or provision operates or would prospectively operate to invalidate this Agreement, in whole or in part, then such clause or provision only shall be deemed deleted, as though not contained, and the remainder of this Agreement, shall remain operative and in full force and effect.  Without limitation of the foregoing, this Agreement and all other agreements made by Borrowers relating directly or indirectly to the Indebtedness are expressly limited so that in no event or contingency whatsoever shall the amount of interest received, charged or contracted for by Lender exceed the highest lawful amount of interest permissible under the laws of the State.  If, under any circumstances whatsoever, performance of any provision of the Note, the other Loan Documents or this Agreement, at the time performance of such provision shall be due, shall result in the highest lawful rate of interest permissible under the laws of the State being exceeded, then ipso facto, the amount of interest received, charged or contracted for by Lender shall be reduced to the highest lawful

Page 12

amount of interest permissible under the laws of the State, and if for any reason whatsoever, Lender shall ever receive, charge or contract for, as interest, an amount which would be deemed unlawful, such amount of interest deemed unlawful shall be applied to principal (whether or not due and payable) or refunded to Borrowers (if all principal has been paid) and not to the payment of interest.

22. **Successors or Assigns.** Whenever any Party is named or referred to in this Agreement, the heirs, executors, legal representatives, successors, successors-in-title and assigns of such Party shall be included. All covenants and agreements in this Agreement shall bind and inure to the benefit of the heirs, executors, legal representatives, successors, successors-in-title and assigns of the Parties, whether so expressed or not.

23. **Dismissal of Pending Matters.** Subject to and conditioned upon Lender's indefeasible receipt of the Discounted Payoff Amount on the Closing Date and the Borrowers' fulfillment of all other obligations herein: (a) Lender and Guarantor shall dismiss, with prejudice, the case entitled *MSCI 2007-IQ16 Retail 9654, LLC v. Gary J. Dragul*, Case No. 1:14-cv-00287-TSB pending in the United States District Court For The Southern District of Ohio Western Division (Cincinnati) (the "**Guarantor Case**"); and (b) Lender and Borrower shall dismiss, with prejudice, the Foreclosure Case.

24. **Stay of Pending Matters.** In order to minimize additional litigation costs, within five days after executing this Agreement, subject to the filing of the amended answer by the Borrowers, as more fully set forth in paragraph 5(b) of this Agreement, Borrowers and Lender shall file a motion in the Foreclosure Case, seeking to hold the matter in abeyance and requesting that the Court vacate all pending scheduling orders, discovery cut offs and all other pending deadlines, subject to (a) dismissal of the Foreclosure Case if the Discounted Payoff Amount is remitted on or before the Forbearance Expiration Date; or (b) reinstatement of such deadlines after the Forbearance Expiration Date if the Discounted Payoff Amount is not timely remitted to Lender..

25. **Bankruptcy Court Approval.** If the Bankruptcy Cases have not been dismissed as of the Effective Date of this Agreement, then this Agreement will be subject to, and shall not become effective, until approved by written order of the Bankruptcy Court or entry of an order providing for the dismissal of the Bankruptcy Cases. If the Bankruptcy Court declines to approve the material terms and conditions of the Agreement, this Agreement shall be null and void and have no further force and effect, and each of the parties hereto shall be free to exercise any and all of their respective rights and remedies with respect to the matters that are subject of this Agreement.

26. **Governing Law.** Unless otherwise provided for in this Agreement, in all other respects, this Agreement shall be governed, construed, applied and enforced in accordance with the laws of the State of Ohio and applicable laws of the United States of America.

27. **WAIVER OF TRIAL BY JURY.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, BORROWERS, GUARANTOR AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, OR THE ENVIRONMENTAL INDEMNITY AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF EITHER PARTY OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS UNDER THE LOAN DOCUMENTS AND THE ENVIRONMENTAL INDEMNITY AGREEMENT OR IN ANY WAY RELATING TO THE PROPERTY (INCLUDING, WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT, AND ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE. THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER THIS AGREEMENT.

Page 13

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

Please sign below to acknowledge Borrowers' agreement to the above terms.

Very truly yours,

**MSCI 2007-IQ 16 Retail 9654, LLC**

By:     LNR Partners, LLC, a Florida limited liability company

By: _____

Name: _____ Arnold Shulkin

Title: _____ Vice President

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

Page 15

## (BORROWERS' SIGNATURE PAGE TO AGREEMENT)

**AGREED TO AND ACCEPTED THIS**

_26th_ **DAY OF** _June_ , 20_15_:

**BORROWERS:**

_Prospect Square 07A, LLC,_ an Ohio limited liability company

By:  GDA Real Estate Management, Inc., its Manager

By: _____
      Gary J. Dragul, President

_Prospect Square 07B, LLC,_ an Ohio limited liability company

By:  GDA Real Estate Management, Inc., its Manager

By: _____
      Gary J. Dragul, President

_Prospect Square 07C, LLC,_ an Ohio limited liability company

By:  GDA Real Estate Management, Inc., its Manager

By: _____
      Gary J. Dragul, President

_Prospect Square 07D, LLC,_ an Ohio limited liability company

By:  GDA Real Estate Management, Inc., its Manager

By: _____
      Gary J. Dragul, President

_Prospect Square 07E, LLC,_ an Ohio limited liability company

By:  GDA Real Estate Management, Inc., its Manager

By: _____
      Gary J. Dragul, President

MIAMI 4623364.3 79681/41968

## SCHEDULE 1

## MATERIAL LEASES SCHEDULE

No applicable leases.

## JOINDER BY AND AGREEMENT OF GUARANTOR
### (Loan No. M280207025)

**Gary J. Dragul** ("**Guarantor**"), being guarantor(s) of the Loan (as such term is defined in that certain DPO Letter Agreement of even date herewith by and between **MSCI 2007-IQ16 Retail 9654, LLC**, as "Lender", and **Prospect Square 07A, LLC, Prospect Square 07B, LLC, Prospect Square 07C, LLC, Prospect Square 07D, LLC, Prospect Square 07E, LLC** ("**Borrowers**") pursuant to that certain Guaranty dated as of October 10, 2007 executed by Guarantor in favor of Original Lender, and that certain Environmental Indemnity Agreement executed by Guarantor and Borrowers in favor of Original Lender, as both are now held by Lender (collectively, the "**Guaranty**"), hereby represents, warrants, acknowledges and agrees with Lender the following:

1.  **Reaffirmation of Guaranty**.  Guarantor consents to the execution and delivery of the Agreement by Borrowers and agrees and acknowledges that the liability of such Guarantor under the Guaranty shall not be diminished in any way by the execution and delivery of the Agreement or by the consummation of any of the transactions contemplated thereby, except to the extent expressly provided for in the Agreement.

2.  **Confirmation of Representations and Covenants**.  Guarantor confirms the representations and warranties and agrees to the covenants regarding Guarantor set forth in the Agreement.

3.  **WAIVER OF TRIAL BY JURY**.  GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS JOINDER, THE NOTE, THE SECURITY INSTRUMENT, OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF GUARANTOR OR LENDER RELATING TO THE LOAN AND THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS JOINDER.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER ENTERING INTO THE AGREEMENT.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.

4.  **Defined Terms**.  All terms that are used herein that are not defined herein shall have the meaning ascribed to them in the Agreement.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

Guarantor has executed and delivered this Joinder to be effective as of the Effective Date of the Agreement.

GUARANTOR:

_____
**Gary J. Dragul**, an individual

MIAMI 4623364.3 79681/41968

## AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY

THIS AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY (this "**Agreement**") is made and entered into as of the ___ day of June, 2015 ("**Effective Date**"), by and among PROSPECT SQUARE 07 A, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 B, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 C, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 D, LLC, an Ohio limited liability company and PROSPECT SQUARE 07 E, LLC, an Ohio limited liability company (collectively, "**Seller**") and ACF PROPERTY MANAGEMENT, INC., a California corporation ("**Buyer**").

## ARTICLE 1

## BASIC DEFINITIONS

*Actual Knowledge.* As used in this Agreement, the phrase "**Actual Knowledge**" shall refer only to the current actual knowledge of Gary J. Dragul (the "**Seller's Representative**"), and shall not be construed, by imputation or otherwise, to refer to the knowledge of Seller or of any officer, director, agent, manager, member, representative, employee or advisor of Seller, or of any attorney or advisor to Seller, or any officers, directors or employees of any attorney, advisor or its affiliates, or impose upon Seller's Representative any duty to inquire into or investigate the matter to which such actual knowledge, or absence thereof, pertains, and Seller's Representative shall have no liability with respect to statements, representations and warranties made herein.

*Bill of Sale.* As defined in Article 4.1(b)(ii)

*Business Day.* As used herein, a "**Business Day**" is any day that is not a Saturday, Sunday, legal holiday or day on which banking institutions are generally authorized or obligated by law to close in the State of Ohio. Any time period not specifically referring to Business Days shall be measured in calendar days; however, if the Closing Date is not set to occur on a Business Day, or if any period of time set forth in this Agreement expires on a day which is not a Business Day, then such Closing Date or other expiration date or date for performance shall be on the next Business Day.

*Closing.* The closing of the escrow described in ARTICLE 4 and transfer of possession of the Property.

*Closing Date.* The date upon which the Closing occurs, which date shall be no later than the date specified in Article 4.5.

*Closing Statement.* As defined in Article 4.2(c)

*Code.* The Internal Revenue Code of 1986, as amended from time to time.

*Contract Period.* The period from the Effective Date through and including the Closing Date.

*Contract Period Damage.* As defined in Article 6.1(a)

## EXHIBIT 2

***Deed.***  As defined in Article 4.1(b)(i)

***Deposit.***  Good Funds in the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) payable by Buyer in accordance with Article 5.

***Effective Date.***  The date entered in the introductory paragraph above, which shall be the date that both Buyer and Seller have executed this Agreement and delivered an executed copy thereof to each other.

***Foreign Person.***  A "foreign person" as such term is used and defined in Section 1445 of the Code.

***General Assignment and Assumption Agreement.***  As defined in Article 4.1(b)(ii)

***Good Funds.***  Wire transfer or other immediately available U.S. federal funds.

***Inspection Period.***  The period beginning on the Effective Date and ending at 5:00 p.m. Mountain Time on June 25, 2015.

***Inspections.***  Any inspections, studies, tests and investigations relating to the Property including, without limitation, the physical, environmental, economic and legal condition of the Property including, without limitation, economic reviews and analyses, soils tests, engineering analyses, environmental analyses and analysis of any applicable records of the planning, building, public works or any other governmental or quasi-governmental entity having or asserting jurisdiction over the Property.

***Intangible Property.***  Seller's rights and interests in the following: (i) the Leases (defined below); (ii) any Service Contracts (defined below); (iii) any governmental licenses, permits and approvals held by Seller relating to the occupancy or use of the Real Property; and (iv) any existing warranties held by Seller and given by third parties with respect to the Real Property.

***Leases.***  All leases and/or rental agreements for occupancy of any portion of the Real Property.  Seller shall provide Buyer with notice and copies of all new leases, lease amendments, extensions and terminations occurring after the execution of this Agreement and prior to closing.

***Limitation Period.***  As defined in Article 3.3.

***Original Survey.***  The existing survey of the Real Property provided to Buyer as part of the Seller's Deliveries.

***Personal Property.***  Seller's interest, if any, in all furniture, fixtures, machinery, appliances, equipment and other personal property located on the Real Property and utilized in connection with the ownership and operation of the Real Property by Seller, but specifically excluding any and all personal computers, software, facsimile machines and copy machines located on the Real Property or utilized in connection therewith.

2

**Prohibited Person.** As used herein: (i) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "**Executive Order**"); (ii) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") at its official website, http://www.treas.gov/offices/enforcement/ofac; (iv) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (v) a person or entity that is affiliated with any person or entity identified in clauses (i), (ii), (iii) and/or (iv).

**Property.** Collectively, the Real Property, the Personal Property and the Intangible Property.

**Purchase Price.** As defined in Article 2.2.

**Real Estate Compensation.** As defined in Article 6.2.

**Real Property.** That certain real property and improvements commonly known as Prospect Square, located at 9654-9722 Colerain Avenue, Cincinnati, OH, and more particularly described on Exhibit A.

**Recorded Documents.** As defined in Article 4.2(d)

**Seller's Repairs.** As defined in Article 6.1(c)

**Service Contracts.** Any service contracts pertaining to the Property, if any, including, but not limited to contracts for landscaping, HVAC, elevator, security, snow removal, trash, sweeping/porter services, exterior lighting and janitorial.

**Title Company.** Fidelity National Title Insurance Company at the office listed in Article 6.4 below.

**Title Policy.** An ALTA extended owner's policy of title insurance in the amount of the Purchase Price, insuring title to the Real Property in Buyer, subject only to the Permitted Encumbrances.

**Title Report.** The title commitment with respect to the Real Property issued by Title Company and delivered, together with the exceptions listed therein, to Buyer within five (5) business days after the Effective Date.

3

ARTICLE 2

PURCHASE AND SALE

2.1     *Purchase and Sale.*  Seller agrees to sell the Property to Buyer, and Buyer agrees to purchase the Property from Seller upon all of the terms, covenants and conditions set forth in this Agreement.

2.2     *Purchase Price.*  The purchase price for the Property (the "**Purchase Price**") shall be the sum of Twelve Million Two Hundred Thousand and No/100 Dollars ($12,200,000.00) payable as follows:

(a)     Payment of the Deposit (in accordance with Article 5.1 hereof).

(b)     Payment of the balance of the Purchase Price in Good Funds through the escrow established pursuant to Article 4.1 on the Closing Date.

2.3     *Buyer's Review and Seller's Disclaimer.*

(a)     *Inspections.*  During the Inspection Period, Buyer, at its sole cost, shall review the documents identified on Exhibit B attached hereto ("**Seller's Deliveries**") which have been delivered by Seller before  the Effective Date, and all matters relating to title to the Property, condition of the Property, feasibility, environmental condition, zoning, land use and any other matter Buyer determines in its full and complete discretion is necessary to determine the feasibility for Buyer to own, develop and operate the Property.  Buyer shall have the right to terminate this Agreement by written notice to Seller not later than the expiration of the Inspection Period, if Buyer does not approve of the Property in its sole and absolute discretion. Failure of Buyer to provide Seller with written notice approving the Property on or before the expiration of the Inspection Period shall be deemed Buyer's disapproval of the Property and this Agreement shall automatically terminate at the end of the Inspection Period.  Upon termination of this Agreement on or before the expiration of the Inspection Period, the Deposit shall be returned to Buyer and the parties shall be released from all obligations under this Agreement, except for those that expressly survive such termination.

(b)     *Permitted Encumbrances.*  On or before the date occurring ten (10) Business Days prior to the expiration of the Inspection Period, Buyer may object in writing to any matters reflected by the original survey delivered to Buyer as part of Seller's Deliveries (the "**Original Survey**"), or any updated or new survey, or the Title Report.  All matters to which Buyer so objects are hereinafter referred to as the "**Non-permitted Encumbrances.**"  All matters reflected by the Original Survey (or any updated or new survey, if applicable) and the Title Report to which Buyer does not object shall be "**Permitted Encumbrances.**"  Seller, at its option, may cure or remove any Non-permitted Encumbrances by giving Buyer written notice of Seller's intention to cure or remove such Non-permitted Encumbrances within five (5) Business Days after receipt of written notice of Buyer's objections; provided however, that Seller shall be obligated to remove, or cause the removal of, prior to or at Closing, any monetary encumbrances placed on the Property by Seller, provided further, however, that Seller may utilize funds from the proceeds of the sale of the Property to satisfy such obligation.

4

(c)    **Objections.**  If Seller fails to give Buyer written notice within five (5) Business Days after receipt of written notice of Buyer's objections or elects not to remove or cure or cannot remove or cure such Non-permitted Encumbrances during the Inspection Period, then Buyer may either: (A) terminate this Agreement on or before the expiration of the Inspection Period, by giving Seller written notice thereof and receive a refund of the Deposit; or (B) elect to purchase the Property subject to the Non-permitted Encumbrances not removed or cured. Any Non-permitted Encumbrances to which Buyer's election to purchase the property is subject shall be deemed thereafter to be Permitted Encumbrances. If Buyer does not provide written notice of termination before expiration of the Inspection Period, Buyer shall be deemed to have elected to purchase the Property as set forth in clause (B) above and to have waived its right to terminate this Agreement pursuant to clause (A) above.

(d)    **Inspection.**  During the Inspection Period, Buyer shall have the right, at its sole cost and expense upon reasonable notice, at least twenty-four (24) hours in advance, to conduct the Inspections.  Buyer shall: (i) perform all such Inspections in a safe and professional manner; (ii) not create any dangerous or hazardous condition on the Property; (iii) comply with all applicable laws with respect to Buyer's Inspections; and (iv) obtain all permits required to be obtained with respect to the Inspections, if any.  Except as expressly required by applicable law or contract, Buyer shall keep confidential the results and findings of Buyer's studies and investigations of the Property.  No investigation shall drill, extract or physically alter or change the condition of the Real Property, without Seller's prior written approval, which approval may be withheld in Seller's sole and absolute discretion.  Buyer shall promptly restore the Property to substantially its previous state in the event any testing is done and no examination, Inspections or tests shall unreasonably interfere with, or damage, any current use of the Property by Seller. Buyer shall carry commercial general liability insurance covering Buyer's activities (and those of Buyer's agents, consultants and employees) in and about the Property, with a limit of not less than Two Million and No/100 Dollars ($2,000,000.00) combined single limit per occurrence, against: (A) claims for personal injury liability including, without limitation, bodily injury, death or property damage liability and covering Buyer; (B) operations of independent contractors engaged by Buyer for services or construction on or about the Property; and (C) contractual liability, which shall name Seller and GDA Real Estate Services, LLC as an additional insured. Buyer shall present a certificate of such insurance in a form reasonably acceptable to Seller before entering onto the Real Property.  In addition, any insurance policy obtained by Buyer shall be written as a primary policy, and shall not be contributing with or in excess of any coverage, which Seller may carry.  The liability limits of the above-described insurance policies shall in no manner limit the liability of Buyer under the terms of this Agreement. Seller shall have the right to be present or appoint a representative to accompany Buyer in connection with Buyer's entry on the Property, and Buyer shall give to Seller reasonable prior telephonic and written notice of any such proposed entry, specifying the purpose and duration thereof, in order to facilitate the same. Buyer's rights hereunder shall be subject to the rights of all tenants on the Property, whom Buyer agrees not to interview or question without having provided Seller at least one (1) Business Day's prior written notice. Buyer shall defend, indemnify and hold Seller

harmless for, from and against any claims, demands, actions, liabilities and obligations (including, but not limited to, mechanics' and materialmen's liens and all reasonable attorneys' fees and costs) arising from Buyer's activities on the Property. Buyer's obligations under this Article 2.3(d) shall expressly survive the Closing or earlier termination of this Agreement.

(e) *Approval of Property.* Buyer hereby agrees that approval of the Property as set forth herein shall constitute an acknowledgment that: (i) Buyer has concluded whatever Inspections Buyer desired to conduct relating to the Property; (ii) Buyer is relying solely on its own investigations as to the Property and its value and is assuming the risk that adverse physical, economic or other conditions (including, without limitation, adverse environmental conditions (including, without limitation, soils and groundwater conditions)) and status of compliance with the requirements of the Americans With Disabilities Act of 1990 or the Fair Housing Act of 1968, as amended) may not have been revealed by such investigation.

(f) *Release.* Except with respect to any claims arising out of any breach of covenants, representations or warranties set forth in Article 3.1 below, Buyer, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller, its agents, partners, members, managers, affiliates, successors and assigns from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this Agreement, which Buyer has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Property. Buyer hereby specifically acknowledges that Buyer has carefully reviewed this Article 2.3(f) and discussed its import with legal counsel and that the provisions of this Article 2.3(f) are a material part of this Agreement.

**Buyer's Initials:** _____

2.4 *Existing Loan/Bankruptcy Action Contingency.* The obligations of Seller and Buyer shall be conditioned upon Seller, on or before the Closing Date, causing: (a) the Property to be released from the lien of the existing loan encumbering the Property, (b) the bankruptcy court to approve the sale of the Property by Seller to Buyer, upon terms reasonably satisfactory to Seller, or the dismissal of the pending bankruptcy proceedings of Seller; (c) the execution of a global settlement agreement between Seller, any guarantor associated with Seller, and the existing lender associated with the Property. In the event that any of the contingencies set forth in subparagraphs (a), (b) or (c) are not satisfied on or before the Closing Date, Seller and Buyer may each terminate this Agreement upon written notice to the other, in which case the Deposit shall be returned to Buyer and both parties shall be released from liability under this Agreement, except for those obligations that expressly survive such termination.

ARTICLE 3

**COVENANTS, WARRANTIES AND REPRESENTATIONS**

3.1 *Seller's Warranties and Representations.* Seller hereby represents and warrants to Buyer as follows:

6

(a)    Seller is a duly organized limited liability company formed pursuant to the laws of the State of Ohio has full power and lawful authority to enter into and carry out the terms and provisions of this Agreement and to execute and deliver all documents which are contemplated by this Agreement and all actions of Seller and of its member(s) and manager(s) necessary to confer such power and authority upon the persons executing this Agreement and all documents which are contemplated by this Agreement on behalf of Seller have been taken, except as outlined in Article 2.4 above.

(b)    Seller, without any duty of independent investigation or further inquiry, has no Actual Knowledge, as of Effective Date, that:

(i)    Seller has received any written notice from any governmental authorities that eminent domain proceedings for the condemnation of the Real Property are pending.

(ii)    except as otherwise disclosed to Buyer, Seller has received any written notice of any threatened or pending litigation against Seller which would materially and adversely affect the Real Property.

(iii)    Seller has received any written notice from any governmental authority that the improvements located on the Real Property are presently in violation of any applicable building codes.

(c)    During the Contract Period, Seller shall maintain and operate the Property in accordance with the same standards Seller has heretofore observed in its ownership and management of the Property.

(d)    From the Effective Date until the Closing Date Seller shall continue all Service Contracts and Leases in full force and effect, neither cancel, amend nor renew any of the same nor enter any new leases, without Buyer's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, except that Seller shall have the right, without any requirement to obtain consent of Buyer, to terminate any Lease in which the tenant thereunder is in default beyond any applicable cure period.

(e)    That Seller and any guarantor associated with Seller have or will enter into a global settlement agreement with the existing lender associated with the Property that is contingent on Closing.

(f)    If any of Seller's representations and warranties set forth in this Article 3.1 are untrue in any material respect, prior to the Closing Date, Buyer, as its sole and exclusive remedy, may terminate this Agreement by delivering written notice to Seller and receive a refund of the Deposit, and following the Closing Date, subject to Article 3.3, Buyer may avail itself of any other remedies set forth in this Agreement.

3.2    **Buyer's Warranties and Representations.**    Buyer hereby represents and warrants to Seller as follows:

7

(a)     Buyer is duly formed pursuant to the laws of the state of its organization and has full power and lawful authority to enter into and carry out the terms and provisions of this Agreement and to execute and deliver all documents which are contemplated by this Agreement and all actions of Buyer and of its member(s) and manager(s) necessary to confer such power and authority upon the persons executing this Agreement and all documents which are contemplated by this Agreement on behalf of Buyer have been taken.

(b)     Buyer has, and as of the Closing Date shall have, full power and lawful authority to enter into and carry out the terms and conditions of this Agreement and to execute and deliver all documents which are contemplated by this Agreement.

(c)     All action necessary for the due authorization of this Agreement and the purchase of the Property and other transactions herein contemplated have been taken, and all actions necessary to confer such power and authority upon the persons executing this Agreement and all documents which are contemplated by this Agreement to be executed on behalf of Buyer or its assignee have or by the time of Closing will have been taken.

(d)     Buyer is not bankrupt or insolvent under any applicable Federal or state standard, has not filed for protection or relief under any applicable bankruptcy or creditor protection statute and has not been threatened by creditors with an involuntary application of any applicable bankruptcy or creditor protection statue.   Buyer and Seller have negotiated this agreement at arms length and the consideration to be paid represents fair value for the assets to be transferred.

(e)     Buyer is neither a Foreign Person nor a Prohibited Person.

(f)     The funds or other assets Buyer will transfer to Seller under this Agreement are not: (i) the property of, nor beneficially owned, directly or indirectly, by a Prohibited Person; or (ii) the proceeds of specified unlawful activity as defined by 18 U.S.C. §1956(c)(7).

The provisions of this **Article 3.2** shall survive the Closing.

3.3     ***Limitations on Warranties and Representations.***   The parties agree that (a) Seller's warranties and representations contained in this Agreement and in any document (including any certificate) executed by Seller pursuant to this Agreement shall survive Buyer's purchase of the Property only for a period of one hundred eighty (180) days after the Closing Date (the "**Limitation Period**"), and (b) Buyer shall provide actual written notice to Seller of any breach of such warranties or representations and shall allow Seller thirty (30) days within which to cure such breach, or, if such breach cannot reasonably be cured within thirty (30) days, an additional reasonable time period, so long as such cure has been commenced within such thirty (30) days and diligently pursued.   If Seller fails to cure such breach after actual written notice and within such cure period, Buyer's sole remedy shall be an action at law for damages as a consequence thereof, which must be commenced, if at all, within the Limitation Period; provided, however, that if within the Limitation Period Buyer gives Seller written notice of such a breach and Seller commences to cure and thereafter terminates such cure effort, Buyer shall have an additional thirty (30) days from the date of such termination within which to commence

an action at law for damages as a consequence of Seller's failure to cure. The Limitation Period referred to herein shall apply to known as well as unknown breaches of such warranties or representations. In the event of a change in a representation or warranty, or breach of a covenant of Seller during the Contract Period, or in the event that Seller discovers that any information in a representation or warranty is untrue in any material respects, absent Seller's fraud, willful misconduct or intentional misrepresentation, Buyer's sole and exclusive remedy shall be to terminate this Agreement and receive the return of the Deposit or waive said event or circumstance and any action or claim against Seller and close on its purchase of the Property pursuant to the terms and conditions stated herein.

## ARTICLE 4

## ESCROW AND CLOSING

4.1    *Escrow Arrangements.*    An escrow for the purchase and sale contemplated by this Agreement shall be opened by Seller with Title Company. In addition to the Deposit, on or before the Closing Date, Seller and Buyer shall deliver escrow instructions to the Title Company consistent with this Article 4 and the parties shall deposit into escrow the funds and documents described below.

(a)    Buyer shall deposit or cause to be deposited on or before 9:00 a.m. Mountain Time on the Closing Date:

(i)    The balance of the Purchase Price, plus sufficient Good Funds to pay Buyer's share of all escrow costs, prorations and closing expenses as set forth in Articles 4.3 and 4.4 below.

(ii)    A counterpart assignment and assumption agreement with regard to the assignment of the Leases, Service Contracts and Intangible Property affecting the Property as of the Closing Date (the "**General Assignment and Assumption Agreement**"), in the form attached hereto as Exhibit D, duly executed by Buyer.

(iii)    Such other instruments as may reasonably be required to effect the conveyance of the Property, with the effect that, after the Closing, Buyer shall have succeeded to all the rights, titles and interests of Seller in and to the Property.

(b)    Seller shall deposit or cause to be deposited on or before 9:00 a.m. Mountain Time on the Closing Date:

(i)    A duly executed and acknowledged Special Warranty Deed to the Real Property (the "**Deed**") in the form attached hereto as Exhibit C.

(ii)    A duly executed bill of sale conveying the Personal Property (the "**Bill of Sale**").

(iii)    A counterpart of the General Assignment and Assumption Agreement, duly executed by Seller.

9

(iv)     A form letter to the tenants at the Real Property notifying them of the sale of the Property to Buyer and instructing the tenants to pay rent at the direction of Buyer after the Closing.

(v)     Such other instruments and documents as may reasonably be required to effect the conveyance of the Property, with the effect that, after the Closing, Buyer shall have succeeded to all the rights, titles and interests of Seller in and to the Property.

(vi)     Estoppel certificates in the form required in the respective leases from tenants occupying at least seventy-five percent (75%) or more of the leased area of the Property, which must include an estoppel certificate from Kroger.  Such estoppel certificates shall be dated no later than thirty (30) days from the Closing Date.  Seller shall deliver any estoppel certificates received from tenants to Buyer promptly upon Seller's receipt.  Buyer shall be permitted to contact tenants without prior notice to or approval of Seller for the purposes of obtaining the estoppel certificates or subordination agreements.  The estoppel certificates shall not show any materially adverse matters, including, without limitation, any verbal agreements regarding the Leases or any default or purported default thereunder by any party.  In the event of Seller's failure to deliver the estoppel certificates in the manner required by this subsection, Buyer, as its sole and exclusive remedy, shall have the right to terminate this Agreement upon written notice to Seller and receive the return of the Deposit.

4.2     ***Title Company's Duties and Closing.***     Seller and Buyer shall instruct Title Company to close escrow on the Closing Date by:

(a)     Recording all documents as may be necessary to clear title in accordance with the requirements of this Agreement.

(b)     Recording the Deed.

(c)     Paying all closing costs and making all prorations in accordance with Articles 4.3 and 4.4 and a certified closing statement of adjustments and prorations prepared by Title Company and approved by Buyer and Seller prior to the Closing Date (the "**Closing Statement**").

(d)     Delivering or being unconditionally committed to deliver to Buyer: (i) the Title Policy; (ii) the Title Company's certified Closing Statement; (iii) if available, conformed copies of the Deed and any other documents recorded at Closing showing available recordation information (collectively, the "**Recorded Documents**"); and (iv) an original or conformed copy of each of the Bill of Sale, the General Assignment and Assumption Agreement, and copies of all other Buyer documents delivered to Title Company.

(e)     Delivering to Seller: (i) the Purchase Price, plus or minus closing adjustments and prorations; (ii) Title Company's certified Closing Statement; (iii) conformed copies of the Recorded Documents, if available; and (iv) an original of each of the Bill of Sale, the General Assignment and Assumption Agreement and copies of all other Seller documents delivered to Title Company.

10

4.3    *Closing Costs.* Seller and Buyer shall each pay one-half of the escrow fee and the premium charged by the Title Company for a standard owners policy of title insurance. Buyer shall pay: (i) the recording costs for this transaction; (ii) the cost of any updated or new survey; (iii) the additional premium and other charges by Title Company for any extended coverage or any additional endorsements requested by Buyer to the Title Policy; (iv) any documentary fees; and (v) a credit to Seller in an amount up to $800,000 for Seller's reasonable transaction costs. Seller shall pay the real property conveyance fee. Any other miscellaneous closing costs shall be allocated among Seller and Buyer as is customary in connection with commercial real estate transactions in the county where the Property is located. Each party shall pay its own attorneys' fees.

4.4    *Prorations.*

(a)    Rent (whether prepaid or applicable to the current rental period) and all other items of income and expense with respect to the Property shall be prorated between Seller and Buyer as of the Closing Date. Buyer shall be responsible for all leasing costs for all leases executed during the Contract Period, and for any renewals and expansions of leases for existing tenants that become effective during the Contract Period, including without limitation any leasing commissions, tenant improvement costs and legal fees, and Seller shall receive a credit at Closing for the same to the extent paid by Seller prior to Closing. Buyer shall receive a credit in escrow, or payment in Good Funds at Closing, in the amount of any deposits under Leases in effect on the Closing Date, or any portion thereof, which are refundable to the tenants as of the Closing Date. Buyer shall not be entitled to any interest on such deposits that may have accrued prior to the Closing Date unless such interest accrues for the benefit of the tenant under the terms of the applicable Lease or under applicable law. Final proration of operating cost pass-throughs, common area maintenance costs, taxes, additional rents and similar items under the Leases (collectively, "**CAM Expenses**") shall be accomplished at Closing. Seller shall, prior to Closing, prepare an estimate of a reconciliation of CAM Expenses for the period from January 1 of the calendar year in which the Closing occurs to the Closing Date (the "**Interim Reconciliation**"). Upon completion of the Interim Reconciliation, Seller shall immediately deliver to Buyer the Interim Reconciliation. To the extent that the Interim Reconciliation reveals that Seller has undercollected CAM Expenses, Seller shall be paid such undercollected amounts, if and when paid by the applicable tenants as part of the reconciliation of 2015 CAM Expenses in 2016. To the extent that the Interim Reconciliation reveals that Seller has overcollected CAM Expenses, Buyer shall receive a credit from Seller at Closing for such amount overcollected. Seller shall receive a credit in escrow for any refundable deposits and/or bonds held by any utility, governmental agency or service contractor with respect to the Property, and Seller shall assign such deposits or bonds to Buyer. Any rent collected by Buyer after the Closing Date shall be applied first to pay any rent or other amount due for any period following the month in which the Closing occurs, then to pay any rent or other amounts due for the month in which the Closing occurs, then for any period prior to the month in which the Closing occurs. If either Buyer or Seller receives any revenues attributable to the period during which it is not the owner of the Property, said party shall promptly forward such amounts to the other party (if such revenues are only partially attributable to the period during which said party is not the owner of the Property, the amount paid to the other party shall be based upon proration as of the Closing Date as set forth above). For a period of sixty (60) days after the Closing Date, Buyer agrees to invoice

11

tenants for any revenue which is owed to Seller as of the Closing Date or which becomes due thereafter.

 (b) Buyer and Seller shall cooperate to produce no later than three (3) Business Days prior to the Closing Date a schedule of prorations which is as complete and accurate as reasonably possible, which shall be considered final and not subject to reproration following Closing. Buyer shall assume the full responsibility to reprorate with the tenants on the Property under the Leases for the entire calendar year in which the Closing occurs.

 (c) Seller shall be responsible for any real property taxes and assessments due and payable for the Property on or before June 30, 2015. Buyer shall be responsible for any real property taxes and assessments due and payable for the Property thereafter,

 4.5 *Closing Date.* The Closing Date shall occur on July 31, 2015, or such earlier date designated by Buyer upon not less than five (5) business days' prior written notice.

 4.6 *Insurance.* Seller's existing liability and property insurance pertaining to the Property shall be canceled as of the Closing Date, and Seller shall receive any premium refund due thereon.

 4.7 *Delivery of Original Documents.* Seller agrees to deliver to Buyer on or immediately following the Closing Date all original Leases and Service Contracts in Seller's possession pertaining to the Property.

 4.8 *Filing of Reports.* Title Company shall be solely responsible for the timely filing of necessary information, reports, returns, and statements regarding the transaction required by the Code, including, but not limited to, required pursuant to the provisions of Section 6045(e) of the Code (and any similar reports or returns required under any state or local laws) in connection with the closing of the transaction contemplated in this Agreement.

 4.9 *Default and Remedies.*

 (a) *Buyer's Remedies.* In the event Buyer has fulfilled all its obligations under this Agreement, and thereafter Seller fails to close the transaction contemplated under this Agreement in breach of this Agreement, then Buyer, as its sole and exclusive remedy shall, at its election: (i) terminate this Agreement upon written notice thereof to Seller, in which case this Agreement shall be deemed cancelled and of no further force or effect, except for those obligations that specifically survive termination, and the Deposit shall be returned to Buyer; or (ii) treat this Agreement as being in full force, proceed with Closing and thereby waive any further claims for Seller's default under this Agreement.

 Except as expressly provided above, and except for a breach of Seller's representations, covenants or warranties set forth in Article 3.1, of which Buyer did not have knowledge until after the Closing Date, Buyer shall not have the right to pursue any action for damages or specific performance in the event of Seller's default or other failure to perform hereunder.

(b) **_Seller's Remedies_**.  In the event Seller has fulfilled all its obligations hereunder, and thereafter Buyer fails to make or tender any payment as provided in this Agreement, or perform any material covenant, agreement or condition of this Agreement as provided in this Agreement ("**Buyer's Default**"), then Seller may retain or transfer the Deposit as set forth in Article 5.2, except that nothing contained herein shall in any way limit Seller's remedies or recovery related to Buyer's indemnities under Articles 2.3(d) or 6.2.

ARTICLE 5

DEPOSIT

5.1    **_Deposit._**  Within three (3) days after the Effective Date, Buyer shall deposit into escrow with the Title Company the Deposit, which the Title Company shall invest in an interest-bearing cash management account reasonably acceptable to Buyer and Seller.  All interest earned thereon shall be added to, and considered a part of, the Deposit.  Upon Closing, the entire amount of the Deposit shall be credited against the Purchase Price.  The tax identification numbers of the parties shall be furnished to the Title Company upon request.  The Deposit shall be nonrefundable to Buyer upon the expiration of the Inspection Period, unless Buyer exercises its rights to terminate this Agreement set forth in Articles 2.3, 4.9, or 6.1, and in addition, in the event that Buyer shall breach, be unable or otherwise to fail to perform its obligations hereunder, then the entire amount of the Deposit shall be retained by Seller as set forth herein.

5.2    **_Retention of Deposit._**  BUYER AND SELLER HEREBY ACKNOWLEDGE AND AGREE THAT IN THE EVENT OF A BUYER DEFAULT, SELLER SHALL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT FORTHWITH AND WITHOUT FURTHER OBLIGATION TO BUYER AND TO RETAIN OR TRANSFER THE DEPOSIT THEN HELD BY TITLE COMPANY WITH INTEREST ACCRUED THEREON.  SUCH RETENTION OF THE DEPOSIT IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT INSTEAD, IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER. THE PARTIES ACKNOWLEDGE AND AGREE THAT THE ACTUAL DAMAGES WHICH WOULD RESULT TO SELLER AS A RESULT OF A BUYER DEFAULT WOULD BE EXTREMELY DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE AMOUNT OF THE DEPOSIT IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN SUCH EVENT, AND THAT SUCH ESTIMATE IS REASONABLE UNDER THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT.    BY PLACING THEIR RESPECTIVE INITIALS IN THE SPACES HEREINAFTER PROVIDED, THE PARTIES ACKNOWLEDGE AND AGREE THAT UPON A BUYER DEFAULT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF THE DEPOSIT AND THAT SELLER'S RECEIPT AND RETENTION OF THE DEPOSIT SHALL BE THE SOLE REMEDY OF SELLER AT LAW IN THE EVENT OF SUCH BUYER DEFAULT, EXCEPT THAT NOTHING CONTAINED HEREIN SHALL IN

ANY WAY LIMIT SELLER'S REMEDIES OR RECOVERY RELATED TO BUYER'S INDEMNITIES UNDER ARTICLES 2.3(d) OR 6.2.

Buyer's Initials: _____      Seller's Initials: _____

## ARTICLE 6

## MISCELLANEOUS

6.1    *Damage, Destruction or Condemnation.*

(a)    Subject to the provisions of subsection (b) below, Buyer shall be bound to purchase the Property for the Purchase Price as required by the terms of this Agreement without regard to the occurrence of any damage to or destruction of the Property occurring during the Contract Period ("**Contract Period Damage**"). Buyer shall receive a credit in escrow in the amount of any insurance proceeds (plus the amount of Seller's deductible, but less any reasonable costs incurred in securing such proceeds) collected by Seller prior to the Closing Date as a result of any Contract Period Damage which have not been expended by Seller on repair, replacement or restoration of the Property pursuant to subsection (c) below. Seller promptly shall deliver to Buyer any such insurance proceeds as shall be collected by Seller following the Closing Date.

(b)    Notwithstanding the foregoing, if the cost of repair, replacement or restoration of the Property attributable to any Contract Period Damage exceeds Two Hundred Fifty Thousand Dollars and No/100 Dollars ($250,000.00), Buyer may elect to terminate this Agreement by written notice to Seller given not more than ten (10) days following notice of the event of damage or destruction, but in no event later than three (3) days prior to Closing Date. Upon termination of this Agreement pursuant to this subsection (b), the Deposit shall be returned to Buyer. In the event neither party timely elects to terminate this Agreement pursuant to this subsection (b) the provisions of subsection (a) above shall be applicable.

(c)    Upon the occurrence of any Contract Period Damage, Seller may, but shall not be obligated to, use any insurance proceeds collected with respect to such Contract Period Damage to repair, replace or restore the Property to the extent reasonably feasible prior to the Closing Date. Seller's election to commence the repair, replacement or restoration of the Property prior to the Closing Date shall in no way imply that Seller has made any representation or warranty with respect to any work performed in connection with such repair, replacement or restoration ("**Seller's Repairs**"). Seller's Repairs shall be subject to the general disclaimer set forth in Article 2.3 above.

(d)    Notwithstanding anything in this Agreement to the contrary, the insurance proceeds to be credited or delivered to Buyer pursuant to this Article 6.1 shall exclude business

14

interruption or rental loss insurance proceeds, if any, allocable to the period through the Closing Date, which proceeds shall be retained by Seller.

(e)     In the event that prior to the Closing, the Property, or any material part thereof, becomes the subject of a taking by a public authority, then Buyer shall have the right, exercisable by giving notice to Seller within ten (10) days after receiving written notice of such taking, either: (i) to terminate this Agreement and obtain a refund of the Deposit, in which case neither party shall have any further rights or obligations hereunder; or (ii) to accept the Property in its then current condition and proceed to Closing, and to receive an assignment of all of Seller's rights to any condemnation awards payable by reason of such taking after the Closing Date.  If Buyer elects to proceed under clause (ii) above, Seller shall not compromise, settle or adjust any claims to such awards without Buyer's prior written consent, which consent shall not be unreasonably withheld or delayed.  Seller agrees to give Buyer prompt notice of any taking of the Property promptly after Seller receives notice of the same.  If Buyer fails to make an election within the ten-day period mentioned above, Buyer shall be deemed to have elected to exercise its rights under clause (ii) above and the Closing shall be delayed, if necessary, until the later to occur of: (A) the Closing Date; or (B) two (2) days after the expiration of the ten (10) day period.

6.2     *Brokerage Commissions and Finder's Fees.*   Each party hereby agrees to indemnify and defend the other against and to hold the other harmless from any and all loss, cost, liability or expense (including but not limited to attorneys' fees and returned commissions) resulting from any claim for real estate compensation by any person or entity based upon such acts or from payment of real estate compensation to any person by Buyer or by any entity affiliated with Buyer.  The obligations of this provision shall expressly survive Closing or earlier termination of this Agreement.

6.3     *Successors and Assigns.*   Buyer shall not assign this Agreement without the prior written consent of Seller, which consent shall not be unreasonably withheld.  Notwithstanding anything to the contrary herein, no assignment by Buyer hereunder shall relieve Buyer from its obligations as the primary obligor under this Agreement.   Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.

6.4     *Notices.*   All written notices required to be given pursuant to the terms of this Agreement shall be either: (i) personally delivered; (ii) deposited in the United States mail, registered or certified return receipt requested, postage prepaid; (iii) sent for next Business Day delivery by Federal Express or similar nationally recognized overnight courier service; or (iv) transmittal by email of a pdf with a hard copy sent within one (1) Business Day by any of the foregoing means, and addressed as follows:

To Seller:      Prospect Square 07 A, LLC,
                Prospect Square 07 B, LLC,
                Prospect Square 07 C, LLC,
                Prospect Square 07 D, LLC, and
                Prospect Square 07 E, LLC
                c/o GDA Real Estate Management, Inc.
                5690 DTC Boulevard, Suite 515
                Greenwood Village, CO  80111
                Attn:  Gary J. Dragul
                Telephone:  (303) 221-5500
                Email: *acquisitionsgarydragul@gdare.com*

To Buyer:       ACF Property Management, Inc.
                12411 Ventura Boulevard
                Studio City, CA 91604
                Attention:  Alan C. Fox
                Phone: (818) 505-6777
                Email: alan@acfpm.com

To Title Company   Fidelity National Title Insurance Company
                4643 South Ulster Street, Suite 500
                Denver, CO  80237
                Attention: Darren Hone
                Phone: (720) 200-1200
                Email:  *Darren.Hone@fnf.com*

The foregoing addresses may be changed from time to time by written notice.  Notices shall be deemed received upon the earlier of actual receipt or delivery (or refusal to accept delivery), three (3) Business Days following sending pursuant to clause (ii) as provided above, or one (1) Business Day following sending pursuant to clause (iii) above.

6.5     **Time.**  Time is of the essence of every provision contained in this Agreement.

6.6     **Possession.**  Possession of the Property shall be delivered to Buyer on the Closing Date, subject to then existing tenancies.

6.7     **Attorneys' Fees.**  In the event any dispute between Buyer and Seller should result in litigation, the prevailing party shall be reimbursed for all reasonable attorneys' fees and court costs incurred in connection with such litigation at the trial and appellate levels.

6.8     **Construction.**  The parties acknowledge that each party and its counsel have reviewed and participated in the drafting of this Agreement and that no rule of construction to the effect that ambiguities are to be resolved against the drafting party shall be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

16

6.9     *Merger.*  The provisions of this Agreement shall merge with the delivery of the Deed and shall not survive the Closing, except as otherwise specifically provided in this Agreement.

6.10     *Governing Law.*   This Agreement shall be construed and interpreted in accordance with and shall be governed and enforced in all respects according to the laws of the State of Ohio.

6.11     *Disclosure of Information.*  Buyer and its representatives shall hold in strictest confidence all data and information obtained with respect to the Property and its ownership, operation and management, whether obtained before or after the execution and delivery of this Agreement, and shall not use such data or information for purposes unrelated to this Agreement or disclose the same to others except as expressly permitted hereunder.  The preceding sentence shall not be construed to prevent Buyer from disclosing information to its officers and directors to perform their designated tasks in connection with Buyer's inspection of the Property.  However, neither party shall have this obligation concerning information which:  (a) is published or becomes publicly available through no fault of either Buyer or Seller; (b) is rightfully received from a third party; or (c) is required to be disclosed by law.  In the event this Agreement is terminated or Buyer fails to perform its obligations hereunder, Buyer shall promptly return to Seller all of Seller's Deliveries, and any other statements, documents, schedules, exhibits or other written information obtained from Seller in connection with this Agreement or the transactions contemplated hereby and any facsimiles or copies thereof.  In the event of a breach or threatened breach by Buyer or its agents, consultants and/or lenders of this section, Seller shall be entitled to an injunction restraining Buyer from disclosing, in whole or in part, such confidential information.  Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach.

6.12     *Termination Without Breach.*  In the event either party desires to exercise any right expressly provided herein to terminate this Agreement, such party shall give written notice of such termination and the reasons therefor to the other party.  Thereafter, except in the event of a termination based upon a default by either party in the performance of its obligations under this Agreement, each party shall be released from its obligations hereunder and all monies and documents then deposited with the Title Company shall be returned to the party that deposited them, all documents delivered by Seller to Buyer relating to the Property shall be returned or destroyed; provided, however, that nothing herein shall limit Buyer's indemnity set forth in Articles 2.3(d) and 6.2.

6.13     *1031 Exchange.*  Seller shall have the option to dispose of the Property through a tax deferred exchange which qualifies for non-recognition of gain under Section 1031 of the Internal Revenue Code of 1986, as amended.  Buyer shall cooperate with Seller in attempting to effectuate such exchange, including, but not limited to, the execution of such documentation as may be reasonably necessary to effect such exchange, provided that: (i) Buyer shall not incur any additional liability in connection with an exchange for the benefit of Seller; (ii) Buyer shall not be obligated to take title to any real property (other than the Property); and (iii) any additional costs and charges directly attributable to the exchange shall be paid for by Seller.  Buyer shall have the option to purchase of the Property through a tax deferred exchange which qualifies for non-recognition of gain under Section 1031 of the Internal Revenue Code of 1986, as amended.

Seller shall cooperate with Buyer in attempting to effectuate such exchange, including, but not limited to, the execution of such documentation as may be reasonably necessary to effect such exchange, provided that: (A) Seller shall not incur any additional liability in connection with an exchange for the benefit of Buyer; (B) Seller shall not be obligated to take title to any real property (other than the Property); and (C) any additional costs and charges directly attributable to the exchange shall be paid for by Buyer.

6.14    *Counterparts.*  This Agreement may be executed in one or more counterparts.  All counterparts so executed shall constitute one contract, binding on all parties, even though all parties are not signatory to the same counterpart.  Counterparts bearing facsimile or pdf copies of signatures shall be deemed to be originals for purposes of enforcement of this Agreement.  Signature pages may be detached and reattached to physically form one document.

6.15    *Force Majeure.*  The Closing Date shall be extended as is reasonably necessary, but in no event for more than seven (7) days, in the event either party is prevented from performing any material obligation hereunder as a direct result of any acts of God, governmental restrictions (including the suspension of postal or other services), wars or act of terrorism.

6.16    *Entire Agreement.*  This Agreement and the attached exhibits, which are by this reference incorporated herein, and all documents in the nature of such exhibits, when executed, contain the entire understanding of the parties and supersede any and all other written or oral understanding, including, without limitation, any letter of intent.  This Agreement may be modified, extended or amended only upon the express written agreement of the parties.

6.17    *Recording.*  Neither this Agreement nor any memorandum thereof, may be recorded in whole or in part, and any recordation in violation of this Agreement shall be deemed to be a default under this Agreement by the recording party.

6.18    *Remedies.*  Buyer agrees that any liability of Seller under any claim brought prior to the Closing Date pursuant to this Agreement or any document or instrument delivered simultaneously or in connection with, or pursuant to this Agreement, shall be limited solely to the Property, and no other assets of Seller shall be subject to levy or execution.  With respect to any such claim brought following the Closing Date, any liability of Seller shall be limited solely to the assets of Seller and Seller's liability for the same in all events shall not exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) collectively.  In no event shall Buyer seek satisfaction for any such obligation from any of the members, managers, officers, shareholders, partners, directors, trustees, advisors or agents of Seller.  The terms of this Article 6.18 shall survive closing or termination.

*[SIGNATURE PAGES FOLLOW]*

18

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the Effective Date.

SELLER:

PROSPECT SQUARE 07 A, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 B, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 C, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 D, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 E, LLC,
an Ohio limited liability company

By:   GDA Real Estate Management, Inc., a
      Colorado corporation, Manager of each of the above entities

      By: _____
          Gary J. Dragul, President

*Note:  Seller must also initial Article 5.2.*

BUYER:

ACF PROPERTY MANAGEMENT, INC.
a California corporation

By: _____
Name:
Title:

*Note:  Buyer must also initial Section 2.3(g) and Section 5.2.*

19

## ACCEPTANCE BY TITLE COMPANY

Fidelity National Title Insurance Company, referred to in this Agreement as the "**Title Company**," hereby acknowledges receipt of the Deposit together with one (1) fully executed counterpart of this Agreement.  The Title Company certifies that it has received and understands this Agreement and hereby accepts the obligations of Title Company as set forth herein, including, without limitation, its agreement to hold the Deposit and dispose of same, in strict accordance with the terms and provisions of this Agreement.

**TITLE COMPANY:**

FIDELITY NATIONAL TITLE INSURANCE COMPANY

By: _____

Name: _____

Title: _____

Date: _____

# EXHIBIT A
## LEGAL DESCRIPTION

**PARCEL I**

SITUATED IN SECTION 9, TOWN 2, ENTIRE RANGE 1, MIAMI PURCHASE, COLERAIN TOWNSHIP, HAMILTON COUNTY, OHIO AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE CENTERLINE OF SPRINGDALE ROAD, SAID POINT BEING THE INTERSECTION OF THE CENTERLINE OF SPRINGDALE ROAD AND THE NORTH LINE OF SECTION 9; THENCE WITH THE CENTERLINE OF SPRINGDALE ROAD, SOUTH 45° 52' WEST, 197.82 FEET; THENCE DEPARTING THE SAID CENTERLINE OF SPRINGDALE ROAD, SOUTH 43° 53' EAST, 40.00 FEET TO THE SOUTH LINE OF SPRINGDALE ROAD AND THE POINT OF BEGINNING OF THE TRACT HEREIN DESCRIBED; THENCE DEPARTING THE SOUTH LINE OF SPRINGDALE ROAD, SOUTH 43° 53' EAST, 550.00 FEET; THENCE, SOUTH 44° 04' 35" EAST, 101.20 FEET; THENCE, SOUTH 30° 21' 27" EAST, 252.00 FEET; THENCE, SOUTH 59° 38' 33" WEST, 257.49 FEET; THENCE, SOUTH 2° 35' WEST, 182.01 FEET; THENCE NORTH 87° 32' 48" WEST, 33.00 FEET; THENCE, NORTH 2° 35' EAST, 130.70 FEET; THENCE, NORTH 87° 19' WEST, 471.92 FEET TO THE EAST LINE OF COLERAIN AVENUE; THENCE WITH THE SAID EAST LINE OF COLERAIN AVENUE, NORTH 17° 14' 57" WEST, 385.45 FEET; THENCE, DEPARTING THE SAID EAST LINE OF COLERAIN AVENUE, NORTH 75° 10' EAST, 150.87 FEET; THENCE NORTH 38° 31' EAST, 170.20 FEET; THENCE NORTH 45° 52' EAST, 200.00 FEET; THENCE, NORTH 43° 53' WEST, 210.00 FEET TO THE SAID SOUTH LINE OF SPRINGDALE ROAD; THENCE WITH THE SAID SOUTH LINE OF SPRINGDALE ROAD, NORTH 45° 52' EAST, 20.00 FEET TO THE PLACE OF BEGINNING.

**PARCEL II**

SITUATED IN SECTION 9, TOWN 2, ENTIRE RANGE 1, MIAMI PURCHASE, COLERAIN TOWNSHIP, HAMILTON COUNTY, OHIO AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE CENTERLINE OF COLERAIN AVENUE AND THE CENTERLINE OF SPRINGDALE ROAD; THENCE WITH THE CENTERLINE OF COLERAIN AVENUE, SOUTH 17° 11' EAST, 703.32 FEET; THENCE DEPARTING THE SAID CENTERLINE OF COLERAIN AVENUE, SOUTH 87° 19' EAST 76.23 FEET TO A POINT, THE REAL PLACE OF BEGINNING OF THE TRACT HEREIN DESCRIBED; SAID POINT BEING IN THE EAST RIGHT OF WAY LINE OF COLERAIN AVENUE; THENCE SOUTH 87° 19' EAST 400.97 FEET; THENCE NORTH 2° 35' EAST 130.70 FEET; THENCE NORTH 87° 19' WEST, 200.00 FEET; THENCE SOUTH 2° 35' WEST 106.70 FEET; THENCE NORTH 87° 19' WEST, 75.91 FEET; THENCE NORTH 80° 03' WEST, 125.35 FEET TO A POINT IN THE SAID EAST LINE OF COLERAIN ROAD; THENCE WITH THE EAST LINE OF COLERAIN ROAD, SOUTH 03° 40' 21" EAST, 39.86 FEET TO THE PLACE OF BEGINNING.

**EXHIBIT B**

**SELLER'S DELIVERIES**

(i)     The last policy of title insurance issued for the Real Property.

(ii)    The most recent ALTA/ACSM survey for the Real Property.

(iii)   Real and personal property tax records for prior three (3) years, and copies of property tax returns filed, relating to the Property, for the three (3) years prior to the year of execution of this Agreement.

(iv)    Copies of all fire, extended risk, liability and other insurance policies covering the Property and a schedule of premiums thereof, together with a current schedule of any claims affecting the Property and all insurance loss claim records relating to the Property for the past thirty-six (36) months.

(v)     Complete plans and specifications for the Real Property and any amendments thereto, to the extent that they are in the possession of Seller.

(vi)    A schedule of all lawsuits pending or threatened which affect the Property, which schedule shall include a summary of the action, the names of all the parties thereto, including the plaintiff, defendant, and any attorneys, except those suits initiated by Seller against tenants who are no longer located on the Real Property.

(vii)   The books and records accurately reflecting the income and operating expenses for the Property for the prior three (3) years, current year-to-date operating statements, and general ledger statements for past two (2) years, detailing expenses.

(viii)  All service and material contracts, including, without limitation, a vendor list for the following: landscaping, HVAC, elevator, security, snow removal, trash, sweeping/porter services, exterior lighting, and janitorial.

(ix)    Current tenant rent roll, including security deposits, prepaid rents and delinquent rents, together with base year expenses number for each tenant, if applicable ("**Rent Roll**").

(x)     Copies of all existing leases, with any amendments, agreements, or material correspondence relating to the leases (including a summary of any verbal agreements with existing tenants), and other rental agreements related to the Real Property (collectively, the "**Leases**").

(xi)    Tenant ledgers, for the past three (3) years and current year to date, reflecting each individual tenant's payment history under the Leases.

(xii)   All environmental, ADA structural, soils and other reports concerning the Real Property.

(xiii)   Past two (2) years detailed common area maintenance reconciliations for each tenant under the Leases.

(xiv)   Certificates of Occupancy for the improvements on the Real Property, to the extent in Seller's possession, and all Leases.

(xv)   Detailed current parking income from tenants under the Leases (if applicable).

EXHIBIT C

FORM OF LIMITED WARRANTY DEED

After Recording Return to:

_____

## LIMITED WARRANTY DEED

**KNOW ALL MEN BY THESE PRESENTS:** That PROSPECT SQUARE 07 A, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 B, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 C, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 D, LLC, an Ohio limited liability company and PROSPECT SQUARE 07 E, LLC, an Ohio limited liability company (collectively, "Grantor"), for One Dollar ($1.00) and other good and valuable considerations paid, receipt of which is hereby acknowledged, does hereby GRANT WITH LIMITED WARRANTY COVENANTS to _____ ("Grantee") the following real property:

**SEE EXHIBIT A, ATTACHED HERETO AND INCORPORATED HEREIN BY THIS REFERENCE**

**PRIOR INSTRUMENT REFERENCE:** Official Record Book ____ , Page __ of the County, Ohio Deed Records.

**PROVIDED, HOWEVER,** that excepted from Grantor's Limited Warranty Covenants are any and all restrictions, reservations, easements, covenants and agreements of record, zoning restrictions, legal highways, if any, and all real estate taxes and assessments due and payable after the date hereof.

**TAX MAILING ADDRESS:**

**IN WITNESS WHEREOF,** the undersigned, _____ ___;7 (**Note if applicable: the duly authorized of**) the Grantor, has caused this Limited Warranty Deed to be executed as of the _day of _____ , 2013.

[SEE NEXT PAGE FOR SIGNATURES]

C-1

IN WITNESS WHEREOF, the Grantor has executed this deed on the date set forth above.

PROSPECT SQUARE 07 A, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 B, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 C, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 D, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 E, LLC,
an Ohio limited liability company


By:     GDA Real Estate Management, Inc., a
        Colorado corporation, Manager of each of the above entities

        By: _____
              Gary J. Dragul, President

## Exhibit 1
## to Exhibit C, Form of Limited Warranty Deed

## Legal Description

**PARCEL I**

SITUATED IN SECTION 9, TOWN 2, ENTIRE RANGE 1, MIAMI PURCHASE, COLERAIN TOWNSHIP, HAMILTON COUNTY, OHIO AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE CENTERLINE OF SPRINGDALE ROAD, SAID POINT BEING THE INTERSECTION OF THE CENTERLINE OF SPRINGDALE ROAD AND THE NORTH LINE OF SECTION 9; THENCE WITH THE CENTERLINE OF SPRINGDALE ROAD, SOUTH 45° 52' WEST, 197.82 FEET; THENCE DEPARTING THE SAID CENTERLINE OF SPRINGDALE ROAD, SOUTH 43° 53' EAST, 40.00 FEET TO THE SOUTH LINE OF SPRINGDALE ROAD AND THE POINT OF BEGINNING OF THE TRACT HEREIN DESCRIBED; THENCE DEPARTING THE SOUTH LINE OF SPRINGDALE ROAD, SOUTH 43° 53' EAST, 550.00 FEET; THENCE, SOUTH 44° 04' 35" EAST, 101.20 FEET; THENCE, SOUTH 30° 21' 27" EAST, 252.00 FEET; THENCE, SOUTH 59° 38' 33" WEST, 257.49 FEET; THENCE, SOUTH 2° 35' WEST, 182.01 FEET; THENCE NORTH 87° 32' 48" WEST, 33.00 FEET; THENCE, NORTH 2° 35' EAST, 130.70 FEET; THENCE, NORTH 87° 19' WEST, 471.92 FEET TO THE EAST LINE OF COLERAIN AVENUE; THENCE WITH THE SAID EAST LINE OF COLERAIN AVENUE, NORTH 17° 14' 57" WEST, 385.45 FEET; THENCE, DEPARTING THE SAID EAST LINE OF COLERAIN AVENUE, NORTH 75° 10' EAST, 150.87 FEET; THENCE NORTH 38° 31' EAST, 170.20 FEET; THENCE NORTH 45° 52' EAST, 200.00 FEET; THENCE, NORTH 43° 53' WEST, 210.00 FEET TO THE SAID SOUTH LINE OF SPRINGDALE ROAD; THENCE WITH THE SAID SOUTH LINE OF SPRINGDALE ROAD, NORTH 45° 52' EAST, 20.00 FEET TO THE PLACE OF BEGINNING.

**PARCEL II**

SITUATED IN SECTION 9, TOWN 2, ENTIRE RANGE 1, MIAMI PURCHASE, COLERAIN TOWNSHIP, HAMILTON COUNTY, OHIO AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE CENTERLINE OF COLERAIN AVENUE AND THE CENTERLINE OF SPRINGDALE ROAD; THENCE WITH THE CENTERLINE OF COLERAIN AVENUE, SOUTH 17° 11' EAST, 703.32 FEET; THENCE DEPARTING THE SAID CENTERLINE OF COLERAIN AVENUE, SOUTH 87° 19' EAST 76.23 FEET TO A POINT, THE REAL PLACE OF BEGINNING OF THE TRACT HEREIN DESCRIBED; SAID POINT BEING IN THE EAST RIGHT OF WAY LINE OF COLERAIN AVENUE; THENCE SOUTH 87° 19' EAST 400.97 FEET; THENCE NORTH 2° 35' EAST 130.70 FEET; THENCE NORTH 87° 19' WEST, 200.00 FEET; THENCE SOUTH 2° 35' WEST 106.70 FEET; THENCE NORTH 87° 19' WEST, 75.91 FEET; THENCE NORTH 80° 03' WEST, 125.35 FEET TO A POINT IN THE SAID EAST LINE OF COLERAIN ROAD; THENCE WITH THE EAST LINE OF COLERAIN ROAD, SOUTH 03° 40' 21" EAST, 39.86 FEET TO THE PLACE OF BEGINNING.

# EXHIBIT D

## FORM OF GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT

PROSPECT SQUARE 07 A, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 B, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 C, LLC, an Ohio limited liability company, PROSPECT SQUARE 07 D, LLC, an Ohio limited liability company and PROSPECT SQUARE 07 E, LLC, an Ohio limited liability company (collectively, "**Grantor**"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid by _____ _____ (the "**Grantee**"), the receipt and sufficiency of which are hereby acknowledged, has granted, sold, assigned, transferred, conveyed, and delivered and does by these presents grant, sell, assign, transfer, convey and deliver unto Grantee, all of Grantor's rights, titles, and interests in and to the following described properties located in, affixed to, and/or arising or used in connection with the improved property with parking and other amenities (the "**Property**") situated on the land in the County of Hamilton, State of Ohio more particularly described on Exhibit 1 attached hereto and made a part hereof for all purposes:

(a)    Any leases for space on the Property (the "**Leases**"), together with security and other deposits owned or held by Grantor pursuant to the Leases, which Leases and security deposits are described on Exhibit 2 attached hereto;

(b)    The service, maintenance, or management contracts relating to the ownership and operation of the Property which Grantee has elected to assume (the "**Service Contracts**") and attached hereto as Exhibit 3; and

(c)    Any assignable warranties and guaranties relating to the Property or any portion thereof (collectively, the "**Warranties**"); and

Grantor and Grantee hereby covenant and agree as follows:

(i)    Grantee accepts the aforesaid assignment and Grantee assumes and agrees to be bound by and timely perform, observe, discharge, and otherwise comply with each and every one of the agreements, duties, obligations, covenants and undertakings upon the lessor's part to be kept and performed (collectively, "**Lessor's Obligations**") on or after the Closing Date under the Leases and any obligations of Grantor accruing under the Service Contracts on or after the Closing Date; provided that Grantor shall retain responsibility for all Lessor's Obligations to be kept and performed under the Leases prior to the Closing Date and accruing under the Service Contract prior to the date of the Closing.

(ii)    Grantee hereby indemnifies and agrees to hold harmless Grantor from and against any and all liabilities, claims, demands, obligations, assessments, losses, costs, damages, and expenses of any nature whatsoever (including, without limiting the generality of the foregoing, reasonable attorneys' fees and court costs) which Grantor may incur, sustain, or suffer, or which may be asserted or assessed against Grantor on or after the date hereof, arising out of, pertaining to or in any way connected with the obligations, duties, and liabilities under the Leases and the Service Contracts, or any of them, arising from and after the Closing Date.

D-1

(iii)    Subject to the limitations of <u>Articles 3.3 and 6.18</u> of the Agreement for Purchase and Sale, dated June ___, 2015 between Grantor and Grantee, Grantor hereby indemnifies and agrees to hold harmless Grantee from and against any and all liabilities, claims, demands, obligations, assessments, losses, costs, damages, and expenses of any nature whatsoever (including, without limiting the generality of the foregoing, reasonable attorneys' fees and court costs) which Grantee may incur, sustain, or suffer, or which may be asserted or assessed against Grantee on or after the date hereof, arising out of, pertaining to or in any way connected with the obligations, duties, and liabilities under the Leases and the Service Contracts, or any of them, arising prior to the Closing Date.

(iv)    The burden of the indemnities made in <u>paragraphs (ii) and (iii)</u> hereof shall not be assigned.  Except as aforesaid, this Agreement shall bind and inure to the benefit of the parties and their respective successors, legal representatives and assigns.

(v)    Neither this Assignment nor any term, provision, or condition hereof may be changed, amended or modified, and no obligation, duty or liability or any party hereby may be released, discharged or waived, except in a writing signed by all parties hereto.

## *[SIGNATURE PAGES FOLLOW]*

D-2

IN WITNESS WHEREOF, Grantor and Grantee have executed this GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT to be effective as of the _____ day of _____, 2015.

GRANTOR:

PROSPECT SQUARE 07 A, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 B, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 C, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 D, LLC,
an Ohio limited liability company

PROSPECT SQUARE 07 E, LLC,
an Ohio limited liability company

By:    GDA Real Estate Management, Inc., a
       Colorado corporation, Manager

       By: _____
           Gary J. Dragul, President

GRANTEE:

_____,
a _____

By:    _____
Name:  _____

D-3

## <u>Exhibit 1</u>
## <u>to Exhibit D, Form of General Assignment and Assumption Agreement</u>

### Legal Description

**PARCEL I**

SITUATED IN SECTION 9, TOWN 2, ENTIRE RANGE 1, MIAMI PURCHASE, COLERAIN TOWNSHIP, HAMILTON COUNTY, OHIO AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE CENTERLINE OF SPRINGDALE ROAD, SAID POINT BEING THE INTERSECTION OF THE CENTERLINE OF SPRINGDALE ROAD AND THE NORTH LINE OF SECTION 9; THENCE WITH THE CENTERLINE OF SPRINGDALE ROAD, SOUTH 45° 52' WEST, 197.82 FEET; THENCE DEPARTING THE SAID CENTERLINE OF SPRINGDALE ROAD, SOUTH 43° 53' EAST, 40.00 FEET TO THE SOUTH LINE OF SPRINGDALE ROAD AND THE POINT OF BEGINNING OF THE TRACT HEREIN DESCRIBED; THENCE DEPARTING THE SOUTH LINE OF SPRINGDALE ROAD, SOUTH 43° 53' EAST, 550.00 FEET; THENCE, SOUTH 44° 04' 35" EAST, 101.20 FEET; THENCE, SOUTH 30° 21' 27" EAST, 252.00 FEET; THENCE, SOUTH 59° 38' 33" WEST, 257.49 FEET; THENCE, SOUTH 2° 35' WEST, 182.01 FEET; THENCE NORTH 87° 32' 48" WEST, 33.00 FEET; THENCE, NORTH 2° 35' EAST, 130.70 FEET; THENCE, NORTH 87° 19' WEST, 471.92 FEET TO THE EAST LINE OF COLERAIN AVENUE; THENCE WITH THE SAID EAST LINE OF COLERAIN AVENUE, NORTH 17° 14' 57" WEST, 385.45 FEET; THENCE, DEPARTING THE SAID EAST LINE OF COLERAIN AVENUE, NORTH 75° 10' EAST, 150.87 FEET; THENCE NORTH 38° 31' EAST, 170.20 FEET; THENCE NORTH 45° 52' EAST, 200.00 FEET; THENCE, NORTH 43° 53' WEST, 210.00 FEET TO THE SAID SOUTH LINE OF SPRINGDALE ROAD; THENCE WITH THE SAID SOUTH LINE OF SPRINGDALE ROAD, NORTH 45° 52' EAST, 20.00 FEET TO THE PLACE OF BEGINNING.

**PARCEL II**

SITUATED IN SECTION 9, TOWN 2, ENTIRE RANGE 1, MIAMI PURCHASE, COLERAIN TOWNSHIP, HAMILTON COUNTY, OHIO AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE CENTERLINE OF COLERAIN AVENUE AND THE CENTERLINE OF SPRINGDALE ROAD; THENCE WITH THE CENTERLINE OF COLERAIN AVENUE, SOUTH 17° 11' EAST, 703.32 FEET; THENCE DEPARTING THE SAID CENTERLINE OF COLERAIN AVENUE, SOUTH 87° 19' EAST 76.23 FEET TO A POINT, THE REAL PLACE OF BEGINNING OF THE TRACT HEREIN DESCRIBED; SAID POINT BEING IN THE EAST RIGHT OF WAY LINE OF COLERAIN AVENUE; THENCE SOUTH 87° 19' EAST 400.97 FEET; THENCE NORTH 2° 35' EAST 130.70 FEET; THENCE NORTH 87° 19' WEST, 200.00 FEET; THENCE SOUTH 2° 35' WEST 106.70 FEET; THENCE NORTH 87° 19' WEST, 75.91 FEET; THENCE NORTH 80° 03' WEST, 125.35 FEET TO A POINT IN THE SAID EAST LINE OF COLERAIN ROAD; THENCE WITH THE EAST LINE OF COLERAIN ROAD, SOUTH 03° 40' 21" EAST, 39.86 FEET TO THE PLACE OF BEGINNING.

**Exhibit 2**
**to Exhibit D, Form of General Assignment and Assumption Agreement**

**List of Leases**

**Exhibit 3**
**to Exhibit D, Form of General Assignment and Assumption Agreement**

**List of Service Contracts**